# CALIFORNIA v. BROWN

No. 85–1563.   Argued December 2, 1986—Decided January 27, 1987

REHNQUIST, C. J., delivered the opinion of the Court, in which WHITE, POWELL, O'CONNOR, and SCALIA, JJ., joined.   O'CONNOR, J., filed a concurring opinion, *post*, p. 544.   BRENNAN, J., filed a dissenting opinion, in which MARSHALL, J., joined, and in Parts II, III, IV, and V of which STE-

VENS, J., joined, *post*, p. 547. BLACKMUN, J., filed a dissenting opinion, in which MARSHALL, J., joined, *post*, p. 561.

*Jay M. Bloom*, Supervising Deputy Attorney General of California, argued the cause for petitioner. With him on the briefs were *John K. Van de Kamp*, Attorney General, *Steve White*, Chief Assistant Attorney General, and *Harley D. Mayfield*, Assistant Attorney General.

*Monica Knox* argued the cause and filed a brief for respondent.*

CHIEF JUSTICE REHNQUIST delivered the opinion of the Court.

The question presented for review in this case is whether an instruction informing jurors that they "must not be swayed by mere sentiment, conjecture, sympathy, passion, prejudice, public opinion or public feeling" during the penalty phase of a capital murder trial violates the Eighth and Fourteenth Amendments to the United States Constitution. We hold that it does not.

Respondent Albert Brown was found guilty by a jury of forcible rape and first-degree murder in the death of 15-year-old Susan J. At the penalty phase, the State presented evidence that respondent had raped another young girl some years prior to his attack on Susan J. Respondent presented the testimony of several family members, who recounted respondent's peaceful nature and expressed disbelief that respondent was capable of such a brutal crime. Respondent also presented the testimony of a psychiatrist, who stated that Brown killed his victim because of his shame and fear over sexual dysfunction. Brown himself testified, stating that he was ashamed of his prior criminal conduct and asking for mercy from the jury.

*\*Christopher N. Heard* filed a brief for the Criminal Justice Legal Foundation as *amicus curiae* urging reversal.

*Paul W. Cane, Jr.*, and *Paul Hoffman* filed a brief for the American Civil Liberties Union et al. as *amici curiae* urging affirmance.

California Penal Code Ann. § 190.3 (West Supp. 1987) provides that capital defendants may introduce at the penalty phase any evidence "as to any matter relevant to . . . mitigation . . . including, but not limited to, the nature and circumstances of the present offense, . . . and the defendant's character, background, history, mental condition and physical condition." * The trial court instructed the jury to consider the aggravating and mitigating circumstances and to weigh them in determining the appropriate penalty. App. 23–24. But the court cautioned the jury that it "must not be swayed by mere sentiment, conjecture, sympathy, passion, prejudice, public opinion or public feeling." *Id.*, at 20. Respondent was sentenced to death.

On automatic appeal, the Supreme Court of California reversed the sentence of death. 40 Cal. 3d 512, 709 P. 2d 440 (1985). Over two dissents on this point, the majority opinion found that the instruction at issue here violates the Federal Constitution: "'federal constitutional law forbids an instruction which denies a capital defendant the right to have the jury consider any "sympathy factor" raised by the evidence when determining the appropriate penalty . . . .'" *Id.*, at 537, 709 P. 2d, at 453, quoting *People* v. *Lanphear*, 36 Cal. 3d 163, 165, 680 P. 2d 1081, 1082 (1984). Relying on *Eddings* v. *Oklahoma*, 455 U. S. 104 (1982), *Lockett* v. *Ohio*, 438 U. S. 586 (1978), and *Woodson* v. *North Carolina*, 428 U. S. 280 (1976), the court ruled that the instruction "is calculated to divert the jury from its constitutional duty to consider 'any [sympathetic] aspect of the defendant's character or record,' whether or not related to the offense for which he is on trial, in deciding the appropriate penalty." 40 Cal. 3d, at 537, 709 P. 2d, at 453. We granted certiorari to resolve whether such an instruction violates the United States Constitution. 476 U. S. 1157 (1986).

---

*We have noted our approval of this statutory scheme. *California* v. *Ramos*, 463 U. S. 992, 1005, n. 19 (1983). See also *Pulley* v. *Harris*, 465 U. S. 37, 53 (1984).

The Eighth Amendment jurisprudence of this Court establishes two separate prerequisites to a valid death sentence. First, sentencers may not be given unbridled discretion in determining the fates of those charged with capital offenses. The Constitution instead requires that death penalty statutes be structured so as to prevent the penalty from being administered in an arbitrary and unpredictable fashion. *Gregg* v. *Georgia,* 428 U. S. 153 (1976); *Furman* v. *Georgia,* 408 U. S. 238 (1972). Second, even though the sentencer's discretion must be restricted, the capital defendant generally must be allowed to introduce any relevant mitigating evidence regarding his "'character or record and any of the circumstances of the offense.'" *Eddings, supra,* at 110, quoting *Lockett, supra,* at 604. Consideration of such evidence is a "constitutionally indispensable part of the process of inflicting the penalty of death." *Woodson* v. *North Carolina, supra,* at 304 (opinion of Stewart, POWELL, and STEVENS, JJ.). The instruction given by the trial court in this case violates neither of these constitutional principles.

We think that the California Supreme Court improperly focused solely on the word "sympathy" to determine that the instruction interferes with the jury's consideration of mitigating evidence. "The question, however, is not what the State Supreme Court declares the meaning of the charge to be, but rather what a reasonable juror could have understood the charge as meaning." *Francis* v. *Franklin,* 471 U. S. 307, 315–316 (1985); see *Sandstrom* v. *Montana,* 442 U. S. 510, 516–517 (1979). To determine how a reasonable juror could interpret an instruction, we "must focus initially on the specific language challenged." *Francis* v. *Franklin,* 471 U. S., at 315. If the specific instruction fails constitutional muster, we then review the instructions as a whole to see if the entire charge delivered a correct interpretation of the law. *Ibid.* In this case, we need not reach the second step of analysis because we hold that a reasonable juror would not interpret

the challenged instruction in a manner that would render it unconstitutional.

The jury was told not to be swayed by "mere sentiment, conjecture, sympathy, passion, prejudice, public opinion or public feeling." Respondent does not contend, and the Supreme Court of California did not hold, that conjecture, passion, prejudice, public opinion, or public feeling should properly play any role in the jury's sentencing determination, even if such factors might weigh in the defendant's favor. Rather, respondent reads the instruction as if it solely cautioned the jury not to be swayed by "sympathy." Even if we were to agree that a rational juror could parse the instruction in such a hypertechnical manner, we would disagree with both respondent's interpretation of the instruction and his conclusion that the instruction is unconstitutional.

By concentrating on the noun "sympathy," respondent ignores the crucial fact that the jury was instructed to avoid basing its decision on *mere* sympathy. Even a juror who insisted on focusing on this one phrase in the instruction would likely interpret the phrase as an admonition to ignore emotional responses that are not rooted in the aggravating and mitigating evidence introduced during the penalty phase. While strained in the abstract, respondent's interpretation is simply untenable when viewed in light of the surrounding circumstances. This instruction was given at the end of the penalty phase, only after respondent had produced 13 witnesses in his favor. Yet respondent's interpretation would have these two words transform three days of favorable testimony into a virtual charade. We think a reasonable juror would reject that interpretation, and instead understand the instruction not to rely on "mere sympathy" as a directive to ignore only the sort of sympathy that would be totally divorced from the evidence adduced during the penalty phase.

We also think it highly unlikely that any reasonable juror would almost perversely single out the word "sympathy" from the other nouns which accompany it in the instruction:

conjecture, passion, prejudice, public opinion, and public feeling. Reading the instruction as a whole, as we must, it is no more than a catalog of the kind of factors that could improperly influence a juror's decision to vote for or against the death penalty. The doctrine of *noscitur a sociis* is based on common sense, and a rational juror could hardly hear this instruction without concluding that it was meant to confine the jury's deliberations to considerations arising from the evidence presented, both aggravating and mitigating.

An instruction prohibiting juries from basing their sentencing decisions on factors not presented at the trial, and irrelevant to the issues at the trial, does not violate the United States Constitution. It serves the useful purpose of confining the jury's imposition of the death sentence by cautioning it against reliance on extraneous emotional factors, which, we think, would be far more likely to turn the jury against a capital defendant than for him. And to the extent that the instruction helps to limit the jury's consideration to matters introduced in evidence before it, it fosters the Eighth Amendment's "need for reliability in the determination that death is the appropriate punishment in a specific case." *Woodson*, 428 U. S., at 305. Indeed, by limiting the jury's sentencing considerations to record evidence, the State also ensures the availability of meaningful judicial review, another safeguard that improves the reliability of the sentencing process. See *Roberts* v. *Louisiana*, 428 U. S. 325, 335, and n. 11 (1976) (opinion of Stewart, POWELL and STEVENS, JJ.).

We hold that the instruction challenged in this case does not violate the provisions of the Eighth and Fourteenth Amendments to the United States Constitution. The judgment of the Supreme Court of California is therefore reversed, and the cause is remanded for further proceedings not inconsistent with this opinion.

*It is so ordered.*

JUSTICE O'CONNOR, concurring.

This case squarely presents the tension that has long existed between the two central principles of our Eighth Amendment jurisprudence. In *Gregg* v. *Georgia*, 428 U. S. 153, 189 (1976), JUSTICES Stewart, POWELL, and STEVENS concluded that "where discretion is afforded a sentencing body on a matter so grave as the determination of whether a human life should be taken or spared, that discretion must be suitably directed and limited so as to minimize the risk of wholly arbitrary and capricious action." In capital sentencing, therefore, discretion must be "'controlled by clear and objective standards so as to produce non-discriminatory application.'" *Id.,* at 198 (quoting *Coley* v. *State*, 231 Ga. 829, 834, 204 S. E. 2d 612, 615 (1974)). See also *Proffitt* v. *Florida*, 428 U. S. 242, 253 (1976) (joint opinion of Stewart, POWELL, and STEVENS, JJ.) (State must provide "specific and detailed guidance" to the sentencing body). On the other hand, this Court has also held that a sentencing body must be able to consider any relevant mitigating evidence regarding the defendant's character or background, and the circumstances of the particular offense. *Eddings* v. *Oklahoma*, 455 U. S. 104 (1982); *Lockett* v. *Ohio*, 438 U. S. 586 (1978) (plurality opinion).

The issue in this case is whether an instruction designed to satisfy the principle that capital sentencing decisions must not be made on mere whim, but instead on clear and objective standards, violates the principle that the sentencing body is to consider any relevant mitigating evidence. JUSTICE BRENNAN in his dissenting opinion contends that the instruction at issue "precludes precisely the response that a defendant's evidence of character and background is designed to elicit." *Post,* at 548. The Court, on the other hand, holds that the instruction merely admonishes the jury "to ignore emotional responses that are not rooted in the aggravating

and mitigating evidence introduced during the penalty phase." *Ante*, at 542.

In my view, evidence about the defendant's background and character is relevant because of the belief, long held by this society, that defendants who commit criminal acts that are attributable to a disadvantaged background, or to emotional and mental problems, may be less culpable than defendants who have no such excuse. This emphasis on culpability in sentencing decisions has long been reflected in Anglo-American jurisprudence. As this Court observed in *Eddings*, the common law has struggled with the problem of developing a capital punishment system that is "sensible to the uniqueness of the individual." 455 U. S., at 110. *Lockett* and *Eddings* reflect the belief that punishment should be directly related to the personal culpability of the criminal defendant. Thus, the sentence imposed at the penalty stage should reflect a reasoned *moral* response to the defendant's background, character, and crime rather than mere sympathy or emotion.

Because the individualized assessment of the appropriateness of the death penalty is a moral inquiry into the culpability of the defendant, and not an emotional response to the mitigating evidence, I agree with the Court that an instruction informing the jury that they "must not be swayed by mere sentiment, conjecture, sympathy, passion, prejudice, public opinion or public feeling" does not by itself violate the Eighth and Fourteenth Amendments to the United States Constitution. At the same time, the jury instructions—taken as a whole—must clearly inform the jury that they are to consider any relevant mitigating evidence about a defendant's background and character, or about the circumstances of the crime. As JUSTICE BRENNAN's dissent illustrates, however, one difficulty with attempts to remove emotion from capital sentencing through instructions such as those at issue in this case is that juries may be misled into believing

that mitigating evidence about a defendant's background or character also must be ignored. See *post*, at 555.

On remand, the California Supreme Court should determine whether the jury instructions, taken as a whole, and considered in combination with the prosecutor's closing argument, adequately informed the jury of its responsibility to consider all of the mitigating evidence introduced by the respondent. The jury was given instruction 8.84.1, 1 California Jury Instructions, Criminal (4th ed. 1979) (CALJIC), which lists the specific aggravating and mitigating factors the sentencer is to consider in determining punishment. Only one subsection of that instruction even arguably applies to the nonstatutory mitigating factors:

> "Any other circumstance which extenuates the gravity of the crime even though it is not a legal excuse for the crime." CALJIC 8.84.1(k).

The respondent contends that the jury might have understood this instruction as mandating consideration only of mitigating evidence about the circumstances of the *crime*, and not evidence about the defendant's background and character. Moreover, in his closing remarks, the prosecutor in this case may have suggested to the jury that it must ignore the mitigating evidence about the respondent's background and character. In combination with the instructions, the comments of the prosecutor may create a "legitimate basis for finding ambiguity concerning the factors actually considered by the" jury. *Eddings* v. *Oklahoma, supra*, at 119 (O'CONNOR, J., concurring).

Because it is open to the California Supreme Court to determine on remand whether the jury was adequately informed of its obligation to consider all of the mitigating evidence introduced by the respondent, I concur in the judgment and opinion of the Court.

JUSTICE BRENNAN, with whom JUSTICE MARSHALL joins, and with whom JUSTICE STEVENS joins as to Parts II–V, dissenting.

## I

Adhering to my view that the death penalty is in all circumstances cruel and unusual punishment forbidden by the Eighth and Fourteenth Amendments, I dissent from the Court's opinion to the extent that it would result in the imposition of the death penalty upon respondent. *Gregg* v. *Georgia*, 428 U. S. 153, 227 (1976). However, even if I believed that the death penalty could be imposed constitutionally under certain circumstances, I would affirm the California Supreme Court, for that court has reasonably interpreted the jury instruction at issue to divert the jury from its constitutional duty to consider all mitigating evidence introduced by a defendant at the sentencing phase of trial.

## II

A sentencing instruction is invalid if it precludes the sentencer from "considering, as a mitigating factor, any aspect of a defendant's character or record . . . that the defendant proffers as a basis for a sentence less than death." *Lockett* v. *Ohio*, 438 U. S. 586, 604 (1978) (plurality opinion) (emphasis omitted). Furthermore, an instruction cannot stand if it leaves the jury unclear as to whether it may consider such evidence. "[W]e may not speculate as to whether the [sentencer] actually considered all of the mitigating factors and found them insufficient to offset the aggravating circumstances," since our case law "require[s] us to remove any legitimate basis for finding ambiguity concerning the factors actually considered . . . ." *Eddings* v. *Oklahoma*, 455 U. S. 104, 119 (1982) (O'CONNOR, J., concurring).

The issue in this case is whether a jury might reasonably interpret the California jury instruction in either of these two ways. The facial language of the instruction, the manner in which it has been construed in trials in California, and experi-

ence with other provisions of the state sentencing scheme all buttress California's interpretation of its own jury instruction. In light of this evidence, there is simply no warrant for this Court to override the state court's assessment of how a jury in California might reasonably interpret the instruction before us.

### III

### A

The instruction at issue informed the jury: "You must not be swayed by mere sentiment, conjecture, sympathy, passion, prejudice, public opinion or public feeling." App. 20.[1] In forbidding the sentencer to take sympathy into account, this language on its face precludes precisely the response that a defendant's evidence of character and background is designed to elicit, thus effectively negating the intended effect of the Court's requirement that all mitigating evidence be considered. As the plurality said in *Woodson* v. *North Carolina*, 428 U. S. 280, 304 (1976), such evidence is intended to induce consideration of "compassionate or mitigating factors stemming from the diverse frailties of humankind." In *Eddings, supra,* for example, we struck down petitioner's death sentence because of the failure of the trial judge to consider Eddings' troubled childhood as a mitigating factor. The fact that his parents divorced when he was five, that his mother was an alcoholic and possibly a prostitute, and that his father used excessive physical punishment were all deemed relevant to the sentencing decision, 455 U. S., at 107, because of their potential for evoking sympathy for petitioner.

The State acknowledges that sympathy for the defendant is appropriate, but contends that the antisympathy instruction simply prevents the jury from relying on "untethered sympathy" unrelated to the circumstances of the offense or the defendant. Brief for Petitioner 49, 58. Yet, as the Cali-

---

[1] The language of this instruction was drawn from the longer instruction 1.00 of 1 California Jury Instructions, Criminal (4th ed. 1979) (CALJIC).

fornia court has noted on other occasions, see *People* v. *Easley*, 34 Cal. 3d. 858, 875–876, 671 P. 2d 813, 824 (1983), the instruction gives no indication whatsoever that the jury is to distinguish between "tethered" and "untethered" sympathy. The Court nonetheless accepts the notion that a jury would interpret the instruction to require such a distinction. None of the reasons it offers for accepting this implausible construction are persuasive.

First, the Court finds it significant that the jury was instructed not simply to avoid sympathy, but to avoid "mere" sympathy. This word, contends the Court, would likely lead a juror to interpret the instruction "as an admonition to ignore emotional responses that are not rooted in the aggravating and mitigating evidence introduced during the penalty phase." *Ante,* at 542. The instruction, however, counsels the jury not to be swayed by "mere sentiment, conjecture, sympathy, passion, prejudice, public opinion or public feeling." A juror could logically conclude that "mere" modified only "sentiment," so it is by no means clear that the instruction would likely be construed to preclude reliance on "mere sympathy." In order for "mere" to be regarded as modifying "sympathy," as the Court contends, "mere" must be read to modify all the other terms in the instruction as well: conjecture, passion, prejudice, public opinion, or public feeling. By the Court's own logic, since "mere" serves to distinguish "tethered" from "untethered" sympathy, it also serves to distinguish "tethered" from "untethered" versions of all the other emotions listed. Yet surely no one could maintain, for instance, that some "tethered" form of prejudice relating to the case at hand could ever be appropriate in capital sentencing deliberations. Indeed, the Court describes the nouns accompanying "sympathy" in the instructions as "no more than a catalog of the kind of factors that could improperly influence a juror's decision to vote for or against the death penalty." *Ante,* at 543. The single word

"mere" therefore cannot shoulder the burden of validating this antisympathy instruction.

Second, the Court argues that jurors must assume that the defendant would not introduce evidence of character and background if the jury could not consider such information. *Ante*, at 542. It is equally likely, however, that jurors instructed not to rely on sympathy would conclude that the defendant had simply gone too far in his presentation, and that, as in other trial contexts, the jury must look to the judge for guidance as to that portion of the evidence that appropriately could be considered. Instructions are commonly given at the end of trial which clarify the significance of evidence and of events at trial, since the jury is not at liberty to assume that everything that occurs at trial is automatically or equally relevant to its deliberations.

Finally, the Court says that, since "sympathy" is accompanied in the instruction by a list of obviously impermissible factors, a juror would naturally assume that the instruction "was meant to confine the jury's deliberations to considerations arising from the evidence presented, both aggravating and mitigating." *Ante*, at 543. How a juror would be expected to make this leap is unclear. The inclusion of "sympathy" in an expansive list of impermissible emotions would logically lead a juror to conclude that *any* response rooted in emotion was inappropriate. An average juror is likely to possess the common understanding that law and emotion are antithetical, and an instruction that a wide range of emotional factors are irrelevant to his or her deliberation reinforces that notion. It is simply unrealistic to assume that an instruction ruling out several emotions in unqualified language would be construed as a directive that certain forms of emotion are permissible while others are not. While we generally assume that jurors are rational, they are not telepathic.

The vast majority of jurors thus can be expected to interpret "sympathy" to mean "sympathy," not to engage in the tortuous reasoning process necessary to construe it as

"untethered sympathy." We would be far more likely in fact to call into question the fidelity to duty of a juror who did the latter. The assertion that the instruction in question serves the purpose of channeling the jury's sympathy in a legitimate direction is therefore completely unfounded.[2]

Even if the majority's interpretation of the instruction were considered as plausible as that of the state court, this would be insufficient to save the instruction. The very plausibility of the lower court's construction means that there is a significant prospect that a juror would interpret the instruction so as to restrict or obfuscate the duty to consider mitigating evidence. As we held in *Sandstrom* v. *Montana*, 442 U. S. 510 (1979), the fact that a reasonable juror could have construed an instruction to make it unconstitutional is adequate to invalidate that instruction. *Id.*, at 526. The fact that jurors *could* have interpreted the instruction so as to make it lawful is irrelevant, for "we cannot be certain that this is what they *did* do." *Ibid.* (emphasis in original). Even if the state court's interpretation is not ineluctable, it is undeniably reasonable—and that is enough to invalidate the instruction.

## B

Our assessment of the state court's interpretation of the instruction need not rest simply on what seems in the abstract the most plausible response to the instruction's plain language. That court's construction is bolstered by experience

---

[2] The Court also suggests that an antisympathy instruction actually benefits a defendant in that it prevents the sentencer from being influenced by sympathy for the *victim*. *Ante*, at 543. It may be that the instruction produces this result in certain cases. But it also undoubtedly precludes sympathy for the defendant in other instances, since the language of the instruction draws no distinction between these two types of sympathy. The fact that a defendant may on occasion benefit from the provision in question is insufficient to outweigh the fact that the instruction can reasonably be construed to negate the effect of a significant portion of a defendant's mitigating evidence. Whatever speculative benefit the instruction bestows on the defendant cannot be purchased at such a price.

with how the instruction actually has been interpreted in the state trial system. This experience dates back at least to 1970, when the State Supreme Court invalidated an instruction virtually identical to the one at issue in this case. *People* v. *Bandhauer*, 1 Cal. 3d 609, 618, 463 P. 2d 408, 416 (1970). That instruction informed the jury: "The law forbids you to be governed by mere sentiment, conjecture, sympathy, passion, prejudice, public opinion or public feeling." *Ibid.* The court ruled that such guidance was inconsistent with state case law holding that the jury at a penalty trial could not be instructed not to consider sympathy for the defendant, see, *e. g.*, *People* v. *Polk*, 63 Cal. 2d 443, 406 P. 2d 641 (1965).[3] In *Bandhauer*, the court further found that the antisympathy directive was not saved by a companion instruction that told the jury: "[Y]ou are entirely free to act according to your own judgment, conscience and absolute discretion," for that instruction merely created an inconsistency that the jury might well resolve "by concluding that the restriction on sympathy served as an exception to [its] otherwise unlimited discretion." 1 Cal. 3d, at 618–619, 463 P. 2d, at 416.

It was against this backdrop that the state court reviewed the virtually identical instruction in this case. The court had the benefit of experience not only with the earlier instruction invalidated in *Bandhauer*, but with the more recent instruction as well. In its 1983 decision in *Easley*, reviewing the later instruction, the court had noted that the drafters of the antisympathy instruction had cautioned that " '[t]his instruction 1.00 should not be used in the penalty phase of a capital case,' " and that instructions pertaining to the consideration

---

[3] This requirement that the jury not be precluded from relying on sympathy was confirmed after *Furman* v. *Georgia*, 408 U. S. 238 (1972), as consistent with this Court's decisions in *Lockett* v. *Ohio*, 438 U. S. 586 (1978), and *Eddings* v. *Oklahoma*, 455 U. S. 104 (1982). See *People* v. *Robertson*, 33 Cal. 3d 21, 57, 655 P. 2d 279, 301 (1982).

of aggravating and mitigating factors were more appropriate at that stage of trial. 34 Cal. 3d, at 876, and n. 5, 671 P. 2d, at 824, and n. 5 (emphasis omitted) (quoting use note to CALJIC 1.00).

Furthermore, state trial records indicate the frequency with which the antisympathy instruction has been. interpreted to preclude consideration of a defendant's background and character. In this case, for instance, the prosecutor in his closing argument noted that numerous relatives had testified at the penalty phase on behalf of Brown, and that they "told us what a good boy he was at the time in his youth when they knew him. And he brought them gifts and that he cared after his siblings." App. 90. Nonetheless, said the prosecutor:

> "*They did not testify, ladies and gentlemen, regarding any of the factors which relate to your decision in this case.* Their testimony here, ladies and gentlemen, I would suggest, was a blatant attempt by the defense to inject personal feelings in the case, to make the defendant appear human, to make you feel for the defendant, and although that is admirable in the context of an advocate trying to do his job, *you ladies and gentlemen must steel yourselves against those kinds of feelings in reaching a decision in this case.*
>
> "*As the Judge will instruct you, you must not be swayed by sympathy.*" *Id.*, at 90–91 (emphasis added).

The prosecutor in this case thus interpreted the antisympathy instruction to require that the jury ignore the defendant's evidence on the mitigating factors of his character and upbringing. A similar construction has been placed on the instruction in several other cases. In *People* v. *Robertson*, 33 Cal. 3d 21, 655 P. 2d 279 (1982), for instance, the prosecutor informed the jury that the fact that the defendant "didn't get the breaks in life" was irrelevant, because

"[t]hat's a sympathy factor, a sympathy factor that does not focus on the real issue, the crime and person Andrew Robertson was at the time [the crime] was committed." *Id.*, at 56 and 57, n. 22, 655 P. 2d, at 300, and n. 22. He then noted that at the penalty phase defendant had put on evidence that "went to the person of Andrew Robertson, giving Andrew Robertson's history, where he was born, how old he was, what he did as a young man, the fact that he went into the service. That is not a factor. That is irrelevant to your decision in this case." *Id.*, at 57, n. 22, 655 P. 2d, at 300, n. 22. The prosecutor also dismissed the defendant's evidence of his service in Vietnam, declaring: "This is simply a sympathy ploy. It is going outside the evidence and asking you to have sympathy, compassion." *Ibid.*

Still other cases, pending before the State Supreme Court at the time of argument in this Court, illustrate the gloss that consistently has been placed on the antisympathy instruction. In *People* v. *Gates*, Cr. 22263, the prosecutor informed the jury: "'It's not a time to talk for mercy or forgiveness for Oscar Gates. It's too late for that. . . . The evidence that you received in the case, that what you promised the judge you'd base your decision on, because the time now is not for philosophy or religion, mercy, forgiveness, sorry for the family, feelings of guilt on your own part.'" App. to Brief for Respondent 2a (quoting Tr. 1286–1287). In *People* v. *Walker*, Cr. 21707, the prosecutor stated: "'I also mentioned, and I guess I should mention it now—I wasn't going to—the fact that there had been things here which could elicit sympathy. Things which had nothing to do with the case. Mr. Walker belongs to a large family, and those members have been present here for the jury's observations during the case. But again, obviously that has nothing to do with this case.'" App. to Brief for Respondent (quoting Tr. 3298). In *People* v. *Boyde*, Cr. 22584, the jury was informed that its assessment of the aggravating and mitigating factors "'is not a

question, I believe, that should be guided by emotion, sympathy, pity, anger, hate, or anything like that because it is not rational if you make a decision on that kind of basis.'" App. to Brief for Respondent 3a (quoting Tr. 4767). Furthermore, said the prosecutor: "'[S]ympathy is an interesting thing, because even though you try not to consider it, this decision you are going to make has emotional overtones to it. It would be very hard to completely filter out all our emotions, make the decision on a rational basis. Although the instruction says you are to try to do that.'" App. to Brief for Respondent 3a (quoting Tr. 4817).

Experience with the antisympathy instruction therefore reveals that it is often construed as precluding consideration of precisely those factors of character and background this Court has decreed *must* be considered by the sentencer. See *Eddings*, 455 U. S., at 113–114 ("Just as the State may not by statute preclude the sentencer from considering any mitigating factor, neither may the sentencer refuse to consider . . . any relevant mitigating evidence"). Even if the interpretation placed upon the instruction by prosecutors is regarded as the product of excessive zeal, rather than dispassionate construction, the state court had ample reason to conclude that an instruction that consistently lends itself to such plausible construction is likely to leave the jury with the impression that they may not consider certain mitigating evidence, or at least with a sense of confusion on this point. Experience with such instructions over the past 17 years thus provides persuasive support for the state court's construction and invalidation of its own jury instruction.

## IV

The State argues that whatever defect the antisympathy instruction might possess is cured by CALJIC instruction 8.84.1. That instruction lists the specific aggravating and mitigating factors the sentencer is to consider in determining

punishment.[4]    The State urges that subsection (k) of this instruction directs the sentencer to consider all of the defendant's mitigating evidence.    That subsection provides that the jury may take into account "[a]ny other circumstance which extenuates the gravity of the crime even though it is not a legal excuse for the crime."    After defendant's trial in this case, however, the state court in *Easley*, rejected the assertion that the instruction adequately informed the jury as to the scope of mitigating evidence, and directed that, in order to "avoid potential misunderstanding in the future," trial courts should add to the language of subsection (k) the instruction that the jury may consider "any other aspect of [the] defendant's character or record . . . that the defendant

---

[4] Instruction 8.84.1 provides that the jury is to consider the following:

"(a) The circumstances of the crime of which the defendant was convicted in the present proceeding and the existence of any special circumstance[s] found to be true.

"(b) The presence or absence of criminal activity by the defendant which involved the use or attempted use of force or violence or the expressed or implied threat to use force or violence.

"(c) The presence or absence of any prior felony conviction.

"(d) Whether or not the offense was committed while the defendant was under the influence of extreme mental or emotional disturbance.

"(e) Whether or not the victim was a participant in the defendant's homicidal conduct or consented to the homicidal act.

"(f) Whether or not the offense was committed under circumstances which the defendant reasonably believed to be a moral justification or extenuation for his conduct.

"(g) Whether or not the defendant acted under extreme duress or under the substantial domination of another person.

"(h) Whether or not at the time of the offense the capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was impaired as a result of mental disease or defect or the affects *[sic]* of intoxication.

"(i) The age of the defendant at the time of the crime.

"(j) Whether or not the defendant was an accomplice to the offense and his participation in the commission of the offense was relatively minor.

"(k) Any other circumstance which extenuates the gravity of the crime even though it is not a legal excuse for the crime."    CALJIC 8.84.1.

proffers as a basis for a sentence less than death." 34 Cal. 3d, at 878, n. 10, 671 P. 2d, at 826, n. 10. This assessment of subsection (k) as it existed at the time of defendant's trial reflects the fact that the language itself directs attention only to the circumstances of the crime itself, not to broader considerations relating to background or character. This language is consistent with the focus of all other factors described in CALJIC 8.84.1: the nature of the crime or the condition of the defendant at the time it was committed.

Furthermore, experience with the operation of subsection (k) in practice indicates that the instruction was commonly regarded as narrow in scope. In this case, for instance, the prosecutor went down the list of mitigating factors, explicitly mentioning the "other circumstances" of subsection (k), and on each informed the jury that there was no mitigation. App. 94. In *Easley*, "the prosecutor told the jury that sympathy was not one of the mitigating factors which the law authorized it to consider." 34 Cal. 3d, at 879, n. 11, 671 P. 2d, at 826, n. 11. Other cases involving the instruction to consider "any other circumstance which extenuates the gravity of the crime," pending before the State Supreme Court at the time of argument in this Court, also illustrate the fact that the subsection in this form lends itself to such an interpretation. In *People* v. *Payton*, Cr. 22511, the prosecutor told the jury that factor (k) relates to "'some factor at the time of the offense that somehow operates to reduce the gravity for what the defendant did. It doesn't refer to anything after the fact or later.'" App. to Brief for Respondent 4a (quoting Tr. 2125). Evidence of the defendant's "'new Christianity and that he helped the module deputies in the jail while he was in custody'" was irrelevant, said the prosecutor, since factor (k) referred only to "'a fact in operation at the time of the offense.'" App. to Brief for Respondent 4a (quoting Tr. 2125). Thus, concluded the prosecutor, such evidence was "'just some jailhouse evidence to win your sympathy, and that's all.'" *Ibid.*

Similarly, in *People* v. *Hamilton*, Cr. 22311, the prosecutor alluded to factor (k), and maintained that the defendant had presented no evidence that properly could be considered. The defendant, observed the prosecutor, had introduced evidence "'from people who knew the defendant well twelve years ago. None of these people knew the defendant or were with the defendant at or about the time these crimes were occurring.'" App. to Brief for Respondent 6a (quoting 19B Tr. 13–14). In *People* v. *Bigelow*, Cr. 22018, the following colloquy occurred regarding the defendant's motion to modify the death verdict:

> "'COURT: Now we have a catchall K, which is any other circumstances *[sic]* which extenuates the gravity of the crime, even though it is not a legal excuse for the crime. Do you have anything you want to tell me under that factor, Mr. Bigelow?
>
> "'DEFENDANT: Extenuates the gravity of the crime, well, that's—would my sisters and brothers, would their testimony fall into that, my childhood, and not being raised with proper parents, and—would that fall into extenuation of the gravity?
>
> "'COURT: No, I don't think that would. I don't see how your childhood, because you've evidently had a not too happy childhood, but that doesn't give you the right to come to America and take an innocent man and kill him. Does it?'" App. to Brief for Respondent 6a–7a (quoting May 8, 1981, Tr. 28).

Finally, in *People* v. *Walker*, Cr. 21707, the prosecutor told the jury with regard to subsection (k) that it is intended to address only those factors that make "'this crime less serious than it looks when you look at the other factors in the case,'" such as "'the person who[m] he killed was someone who meant harm to his family, someone who had threatened him, someone who had made life miserable.'" App. to Brief for Respondent 7a (quoting Tr. 3279–3280).

The state court thus had more than adequate justification, based on both the plain language of subsection (k) and practical experience with its interpretation by participants in the criminal justice system, to assume that a jury might reasonably interpret that subsection narrowly, and that it was unrealistic to assume that juries would construe it to permit consideration of all of a defendant's mitigating evidence.

Even if the Court ignores this wealth of support for the State's interpretation of subsection (k), and finds that the instruction as it existed at the time of Brown's trial directed the jury to consider all of Brown's mitigating evidence, that is insufficient to save the antisympathy instruction. Such a reading of subsection (k) would simply mean that the jury was confronted with inconsistent instructions likely to create the type of confusion the state court viewed as probable in *Bandhauer*. As we said in *Francis* v. *Franklin*, 471 U. S. 307, 322 (1985): "Nothing in [the] specific sentences or in the charge as a whole makes clear to the jury that one of these contradictory instructions carries more weight than the other. Language that merely contradicts and does not explain a constitutionally infirm instruction will not suffice to absolve the infirmity." Cf. *Sandstrom* v. *Montana*, 442 U. S., at 526 (if possibility of misunderstanding exists, "we have no way of knowing that [the defendant] was not convicted on the basis of the unconstitutional instruction").

Finally, the State argues that, even if subdivision (k) is construed as excluding mitigating evidence not related to the circumstances of the crime, the jurors nonetheless understood that the enumeration of factors in instruction 8.84.1 was not exhaustive. This contention is belied by the fact that the jury was instructed that it "shall consider, take into account and be guided by the applicable factors of aggravating and mitigating circumstances *upon which you have been instructed.*" App. 23 (emphasis added). The plain language of this instruction thus rebuts the State's contention, since

the factors upon which the jury was instructed described only specific types of mitigating evidence. Furthermore, the State Supreme Court has interpreted the instruction quoted immediately above in light of the other portions of the 1978 state death penalty scheme, and has concluded that that scheme "necessarily implie[s] that matters not within the statutory list are not entitled to any weight in the penalty determination." *People* v. *Boyd*, 38 Cal. 3d 762, 773, 700 P. 2d 782, 790 (1985) (footnote omitted).[5] There is therefore no basis for speculation that the jury felt unconstrained by the factors listed in instruction 8.84.1.

## V

The California Supreme Court in this case has provided an eminently reasonable interpretation of the State's antisympathy instruction. The language of the instruction on its face prohibits a jury from relying on sympathy in determining whether to sentence a defendant to death. The defendant literally staked his life in this case on the prospect that a jury confronted with evidence of his psychological problems and harsh family background would react sympathetically, and any instruction that would preclude such a response cannot stand. Furthermore, even acceptance of the State's attenuated interpretation of other instructions does not mean that these provisions cure the problem with the antisympathy instruction, but leads only to the conclusion that the jury was confronted with *contradictory* instructions, a state of affairs that we have declared intolerable.

---

[5] As the court in *Boyd* noted, the potential constitutional infirmity resulting from the fact that none of the factors on its face "appeared broad enough to encompass every aspect of the defendant's character and background he might advance for consideration," 38 Cal. 3d, at 775, 700 P. 2d, at 791, was avoided by the 1983 construction of factor (k) as an open-ended provision permitting the jury to consider any mitigating evidence. See *People* v. *Easley*, 34 Cal. 3d 858, 878, and n. 10, 671 P. 2d 813, 826, and n. 10 (1983).

This Court has proclaimed that in capital cases "the fundamental respect for humanity underlying the Eighth Amendment requires consideration of the character and record of the individual offender and the circumstances of the particular offense as a constitutionally indispensible part of the process of inflicting the penalty of death." *Woodson*, 428 U. S., at 304 (plurality opinion) (citation omitted). Because of the qualitatively different nature of the death penalty, "there is a corresponding difference in the need for reliability in the determination that death is the appropriate punishment in a specific case." *Id.*, at 305. Even construed in its most favorable light, the jury instruction at issue in this case did not come close to providing the requisite assurance that the jury in this case was fully aware of the scope of its sentencing duties. Since Brown's mitigating evidence was composed totally of information on his character and background intended to elicit sympathy, it is highly likely that the instruction eliminated his only hope of gaining mercy from the sentencer. Given our particular concern for the reliability of the procedures used to impose the death penalty, as well as the considerable support for the California court's interpretation, it is baffling that this Court strains to find a way to override the state court's construction of its own jury instruction. I cannot acquiesce in such a course of action, and therefore dissent.

JUSTICE BLACKMUN, with whom JUSTICE MARSHALL joins, dissenting.

I write separately to emphasize a point to which others have alluded, see *ante*, at 545 (O'CONNOR, J., concurring); *ante*, at 548 and this page (BRENNAN, J., dissenting), but which, in my view, has not been brought into full focus.

The defense's goal in the penalty phase of a capital trial is, of course, to receive a life sentence. See Balske, New Strategies for the Defense of Capital Cases, 13 Akron L. Rev. 331, 357 (1979). While the sentencer's decision to accord life to a defendant at times might be a rational or moral one, it also may arise from the defendant's appeal to the sentencer's

sympathy or mercy, human qualities that are undeniably emotional in nature. See Tr. of Oral Arg. 38, 46, 48.

In a capital sentencing proceeding, the sentencer's discretion must be guided to avoid arbitrary or irrational decisions. See *Gregg* v. *Georgia*, 428 U. S. 153, 195 (1976) (opinion of Stewart, POWELL, and STEVENS, JJ.). When a jury serves as the sentencing authority, such guidance is provided, in part, through jury instructions. This Court, however, has recognized and even safeguarded the sentencer's power to exercise its mercy to spare the defendant's life. See *Caldwell* v. *Mississippi*, 472 U. S. 320, 331 (1985), quoting *Caldwell* v. *State*, 443 So. 2d 806, 817 (Miss. 1983) (dissenting opinion) ("'The [mercy] plea is made directly to the jury as only they may impose the death sentence'"); *Eddings* v. *Oklahoma*, 455 U. S. 104, 110 (1982) ("[T]he rule in *Lockett* [v. *Ohio*, 438 U. S. 586 (1978)] is the product of a considerable history reflecting the law's effort to develop a system of capital punishment at once consistent and principled but also humane and sensible to the uniqueness of the individual"); *Gregg* v. *Georgia*, 428 U. S., at 182 (opinion of Stewart, POWELL, and STEVENS, JJ.) ("Rather, the reluctance of juries in many cases to impose the sentence may well reflect the humane feeling that this most irrevocable of sanctions should be reserved for a small number of extreme cases").

The sentencer's ability to respond with mercy towards a defendant has always struck me as a particularly valuable aspect of the capital sentencing procedure. Long ago, when, in dissent, I expressed my fear of legislation that would make the death penalty mandatory, and thus remove all discretion from the sentencer, I observed that such legislation would be "regressive . . . , for it [would] eliminat[e] the element of mercy in the imposition of punishment." *Furman* v. *Georgia*, 408 U. S. 238, 413 (1972). In my view, we adhere so strongly to our belief that sentencers should have the opportunity to spare a capital defendant's life on account of compassion for the individual because, recognizing that the

capital sentencing decision must be made in the context of "contemporary values," *Gregg* v. *Georgia,* 428 U. S., at 181 (opinion of Stewart, POWELL, and STEVENS, JJ.), we see in the sentencer's expression of mercy a distinctive feature of our society that we deeply value.

In the real world, as in this case, it perhaps is unlikely that one word in an instruction would cause a jury totally to disregard mitigating factors that the defendant has presented through specific testimony. When, however, a jury member is moved to be merciful to the defendant, an instruction telling the juror that he or she cannot be "swayed" by sympathy well may arrest or restrain this humane response, with truly fatal consequences for the defendant. This possibility I cannot accept, in light of the special role of mercy in capital sentencing and the stark finality of the death sentence. See *Woodson* v. *North Carolina,* 428 U. S. 280, 305 (1976) (plurality opinion).

I respectfully dissent.