# IN THE SUPREME COURT OF TENNESSEE
## AT KNOXVILLE
### January 9, 2002 Session

## STATE OF TENNESSEE v. JAMES HENDERSON DELLINGER AND GARY WAYNE SUTTON

**Appeal from the Court of Criminal Appeals**
**Circuit Court for Blount County**
**Nos. C-6669, C-6670     D. Kelly Thomas, Jr., Judge**

---

**No. E1997-00196-SC-DDT-DD - Filed May 7, 2002**

---

ADOLPHO A. BIRCH, JR., J., concurring and dissenting.

I concur with the majority's opinion affirming the convictions as to both defendants. With regard to the imposition of the death sentences in this case, however, I cannot agree. My concerns, as expressed below, pertain to: (1) the comparative proportionality review protocol imposed by the majority; and (2) the trial court's refusal, during the sentencing phase, to address a jury question related to the amount of time the defendants would serve under a life sentence.

### I.  Comparative Proportionality Review

In numerous opinions, I have expressed grave concerns about the comparative proportionality review protocol employed by the majority in capital cases. See, e.g., State v. Chalmers, 28 S.W.3d 913 (Tenn. 2000)(Birch, J., concurring and dissenting); State v. Keen, 31 S.W.3d 196 (Tenn. 2000)(Birch, J., concurring and dissenting); State v. Carruthers and Montgomery, 35 S.W.3d 516 (Tenn. 2000)(Birch, J., concurring and dissenting); State v. Sims, 45 S.W.3d 1 (Tenn. 2001)(Birch, J., concurring and dissenting); Terry v. State, 46 S.W.3d 147 (Tenn. 2001)(Birch, J., concurring and dissenting); State v. Stout, 46 S.W.3d 689 (Tenn. 2001)(Birch, J., concurring and dissenting); State v. Bane, 57 S.W.3d 411 (Tenn. 2001)(Birch, J., concurring and dissenting); State v. Godsey, 60 S.W.3d 759 (Tenn. 2001)(Birch, J., concurring and dissenting); State v. McKinney, ___ S.W.3d ___ (Tenn. 2002)(Birch, J., concurring and dissenting); see also State v. Bland, 958 S.W.2d 651 (Tenn. 1997)(Birch, J., concurring and dissenting). I have not detected any meaningful effort to address and rectify these concerns. Because I do not believe that the Court is properly fulfilling its statutory obligation to determine whether "the sentence of death is excessive or disproportionate to the penalty imposed in similar cases,"[1] I respectfully disagree with the decision to affirm the death penalty against these two defendants.

---

[1] Tenn. Code Ann. § 39-13-206(c)(1)(D) (2001).

II. Meaning of Life Sentence

In addition to my views regarding comparative proportionality review, I am deeply concerned about the trial judge's refusal to answer the jury's question about the amount of prison time Dellinger and Sutton would serve if given life sentences. An explanation from the trial court should be deemed essential, in my view, in light of the extensive evidence demonstrating that grave misperceptions about capital sentencing very well may have biased this jury's deliberations. One commentator states:

> There is a pervasive misimpression among jurors that convicted first-degree murderers not given the death penalty will be released on parole well before they actually are, or possibly could be under the law – a kind of hegemonic myth of early release that infects the capital sentencing decision with excessiveness in the use of death as punishment.

William J. Bowers and Benjamin D. Steiner, Death by Default: An Empirical Demonstration of False and Forced Choices in Capital Sentencing, 77 Tex. L. Rev. 605, 716-17 (1999).

The sentencing decision of a capital jury must reflect "a reasoned moral response to the defendant's background, character, and crime." Penry v. Lynaugh, 492 U.S. 302, 319, 109 S. Ct. 2934, 2947, 106 L. Ed. 2d 256 (1989) (quoting California v. Brown, 479 U.S. 538, 545, 107 S. Ct. 837, 93 L. Ed. 2d 934 (1987) (O'Connor, J., concurring)). Certainly, "accurate sentencing information is an indispensable prerequisite to a reasoned determination of whether a defendant shall live or die by a jury of people who may never before have made a sentencing decision." Gregg v. Georgia, 428 U.S. 153, 190, 96 S. Ct. 2909, 2933, 49 L. Ed. 2d 859 (1976) (plurality op.). This principle requires, in my view, that jurors make their decisions "unencumbered by ignorance and supported by information sufficient and relevant for reliable and rational decision-making." See The Constitution Project, Mandatory Justice: Eighteen Reforms to the Death Penalty (2001), available at http://www.constitutionproject.org/dpi/index.html (last visited April 24, 2002).

Extensive proof demonstrates, however, that misunderstandings and misinformation about the law often sway the sentencing decisions of capital juries. Evidence gathered in the Capital Jury Project, a leading study of capital juries upon which this Court has relied in past cases,[2] indicates that a majority of jurors "grossly underestimate how long capital murders not sentenced to death usually stay in prison," and the jurors who hold such erroneous beliefs are "far more likely to vote for death." Bowers and Steiner, supra, at 648, 664; see also Theodore Eisenberg and Martin T. Wells, Deadly Confusion: Juror Instructions in Capital Cases, 79 Cornell L. Rev. 1, 8 (1993) ("Refusing to inform jurors about the statutorily mandated length of nondeath sentences appears to lead jurors

_____

[2]See Van Tran v. State, 66 S.W.3d 790, 802-03 (Tenn. 2001); State v. Hartman, 42 S.W.3d 44, 59 (Tenn. 2001).

to sentence to death when they would not do so if they were more fully informed of the law."). Indeed, most jurors' estimates of the time served by defendants given life sentences fell several years short of the actual mandatory minimum terms required for parole eligibility. Bowers and Steiner, supra, at 648-49. Astonishingly, even in states where the only alternative to the death penalty was life without parole, a large number of jurors believed that defendants could be released in twenty years or less. Id. at 647, 670.

The effect of this pervasive misunderstanding is striking. Jury studies in Georgia and Mississippi have shown that jurors would be more likely to impose a life sentence if assured that "life" meant that the defendant would spend at least 20 or 25 years in prison. See Bowers and Steiner, supra, at 634-37 (citing Anthony Paduano and Clive A. Stafford Smith, Deathly Errors: Juror Misconceptions Concerning Parole in the Impostion of the Death Penalty, 18 Colum. Hum. Rts. L. Rev. 211, 221-24 (1987)). The empirical evidence from the Capital Jury Project demonstrates that the likelihood and timing of the defendant's release was discussed "a great deal" in more than half of the cases examined, and "the jurors who most underestimate the death penalty alternative - those who believe release would usually come in less than ten years - are the ones most likely to take a pro-death stand at each stage of the trial." Id. at 656, 672. In at least one study, 62 percent of jurors said they would disregard a judge's instructions not to consider parole when choosing between a life and a death sentence. See William W. Hood, The Meaning of "Life" for Virginia Jurors and its Effect on Reliability in Capital Sentencing, 75 Va. L. Rev. 1605, n.103 and accompanying text (1989) (citing National Legal Research Group, Report on Jurors' Attitudes Concerning the Death Penalty 7 (1988)). Importantly, a survey of Georgia capital cases revealed that jurors questioned the judge about parole in roughly 25 percent of the cases, and after the judges in those cases declined to elaborate, the juries typically returned with a death sentence in short order. See J. Mark Lane, "Is there Life Without Parole?": A Capital Defendant's Right to a Meaningful Alternative Sentence, 26 Loy. L.A. L. Rev. 327, 335-42 (1993). This evidence suggests, as one commentator states, "that parole concerns may often be the critical, last issue upon which a decision for life or death depends." Bowers and Steiner, supra, at 629.

In this case, it is difficult to ignore the evidence that juror perceptions (or misperceptions) about sentencing may have tainted the decision to impose a death sentence. The jury asked a question related to the length of time Dellinger and Sutton would serve on a life sentence, and after the court declined to answer, it returned with a death sentence. Any presumption that the jury honored the instruction to "concern [itself] with the sentences in these cases only" must be discarded as unrealistic in light of the vast amount of evidence to contradict it. There seems to be, in my view, a substantial probability that the jury returned a death sentence not because it thought death to be an appropriate punishment for the defendants' crimes, but because it wrongly believed that a life sentence would allow the defendants to go free after a short amount of time. Thus, the sentences here are beset by the constitutionally intolerable risk that the death penalty has been "imposed in spite of factors which may call for a less severe penalty." Cf. Lockett v. Ohio, 438 U.S. 586, 605, 98 S. Ct. 2954, 57 L. Ed. 2d 973 (1978) (Burger, C.J., plurality op.). I must conclude that such misunderstandings have compromised the sentencing hearing in this case beyond what should be tolerated by our Constitution. In my view, this Court should hold that Article I, sections 6 and 9

of the Tennessee Constitution mandate, at the very least, that the jury in this case should have been informed of the minimum time the defendants would have to serve before being eligible for parole and the probability, based on comparison to other first degree murder cases, that the defendants would be released upon initial eligibility for parole.[3] If this jury had been given such information, it is evident to me that the result very likely would have been different. Consequently, I would hold that the trial court's refusal to answer the jury's question was reversible error.

### III. Conclusion

For the foregoing reasons, I would reverse the sentences of death for both defendants and remand the case for resentencing. Accordingly, I respectfully dissent.

_____
ADOLPHO A. BIRCH, JR., JUSTICE

---

[3]Given the circumstances of this case, I would submit that Dellinger and Sutton would have been unlikely to be released on parole upon initial eligibility.