IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE

AT KNOXVILLE

JANUARY 1997 SESSION

FILED

October 3, 1997

Cecil Crowson, Jr.
Appellate Court Clerk

| | | |
|---|---|---|
| OLEN EDDIE HUTCHISON, | ) | |
| | ) | |
| Appellant, | ) | No. 03C01-9601-CC-00033 |
| | ) | |
| | ) | Campbell County |
| v. | ) | |
| | ) | Honorable J. Curwood Witt, Judge |
| | ) | |
| STATE OF TENNESSEE, | ) | (Post-Conviction) |
| | ) | |
| Appellee. | ) | |

For the Appellant:

Christopher Van Riper
300 Market Street, Suite 200
Clinton, TN 37716-0506

For the Appellee:

Charles W. Burson
Attorney General of Tennessee
    and
John P. Cauley
Assistant Attorney General of Tennessee
450 James Robertson Parkway
Nashville, TN 37243-0493

William Paul Phillips
District Attorney General
P.O. Box 10
Huntsville, TN 37756-00010
    and
Michael O. Ripley
Assistant District Attorney General
P.O. Box 323
Jacksboro, TN 37757-0323

OPINION FILED:_____

AFFIRMED

Joseph M. Tipton
Judge

**O P I N I O N**

The petitioner, Olen Eddie Hutchison, appeals as of right from the Campbell County Criminal Court's denial of post-conviction relief. He was convicted in 1991 for the first degree murder of Hugh Huddleston and received the death penalty. He was also convicted of conspiracy to take a life and solicitation to commit first degree murder for which he received a total sentence of twenty-two years. The convictions and sentences were affirmed on direct appeal. State v. Hutchison, 898 S.W.2d 161 (Tenn. 1994), cert. denied, ___U.S. ___, 116 S. Ct. 137 (1995). We affirm the denial of post-conviction relief.

The petitioner filed this post-conviction petition on May 4, 1995. An evidentiary hearing was held on September 27, 1995, and the trial court made its determinations. The petitioner contends that the trial court erred in denying him relief, generally claiming as follows:

> (1) The petitioner received the ineffective assistance of counsel as guaranteed by the Sixth and Fourteenth Amendments to the United States Constitution.
>
> (2) The petitioner was denied the due process of law as guaranteed by the Fifth and Fourteenth Amendments to the United States Constitution by prosecutorial misconduct through the introduction of inadmissable evidence and arguments thereon concerning the petitioner's participation in illegal activities for which he had not been charged.
>
> (3) The trial court erred in failing to enter a written order or memorandum on all grounds presented in the petition and in failing to state findings of fact and conclusions of law with regard to each ground as required by T.C.A. § 40-30-118(b).
>
> (4) The trial court erred in refusing to grant the petitioner funds to retain expert services.
>
> (5) The trial court erred in failing to grant the petitioner a continuance.
>
> (6) The trial court erred in failing to order the state to prepare and file transcripts of the arguments of counsel during the guilt and sentencing phases of the petitioner's trial.

2

(7) The trial court erred by failing to find that the cumulative effect of the errors at trial and on appeal violated the petitioner's rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution.

In response, the state contends that the petitioner received the effective assistance of counsel, that the issue concerning the admissibility of evidence of illegal activity was previously determined, that the trial court's failure to enter a written memorandum of law does not warrant a reversal of the trial court's dismissal of the petition, that the petitioner did not demonstrate a need for expert services which would warrant court-ordered funding, that the trial court did not abuse its discretion in denying a third continuance, that the state had in fact filed the record and transcript of the direct appeal of the case, and that the errors did not cumulatively prevent the petitioner from receiving a fair and impartial trial.

The supreme court's direct appeal opinion provides the following synopsis of the evidence presented at the petitioner's trial:

> The record establishes that the victim in this case, Hugh Huddleston, died by drowning while on a fishing trip at Norris Lake in Campbell County. The State's evidence showed that defendant Hutchison and several other men had conspired to kill Huddleston in order to collect almost $800,000 in life insurance proceeds and other benefits.
>
> Huddleston, a bachelor in his mid-forties, had what was described by witnesses as a father-son relationship with Hutchison's co-defendant, Chip Gaylor. In 1984, Huddleston made Gaylor, then 19, the sole beneficiary of his will, under which 95% of the estate would not pass to Gaylor immediately but would be held in trust for distribution to him at the ages of 25 and 30. Huddleston also made Gaylor the beneficiary of an insurance policy and other of his employment benefits, all of which amounted to over $289,000 in value.
>
> The chief prosecution witness was Richard Miller, one of the conspirators and an acquaintance of the defendant and of Gaylor and Huddleston. He told how, during the year before Huddleston's death, he, the defendant, and Gaylor, then 26, were sitting around talking when the defendant mentioned "how much money he could make if he took insurance out on somebody and then had them killed." Gaylor remarked that he would pay the defendant $100,000 to kill someone but that his

"insurance policy" was not good until he was 30. The defendant responded that that was too long to wait.

About a week later, the defendant asked Gaylor to have Huddleston sign some "insurance papers" under the pretense of a tax write-off. According to Miller, Huddleston would do almost anything Gaylor asked. Huddleston signed the papers, and that evening Miller and Gaylor returned them to the defendant, who indicated that he would get back in touch with them. Shortly afterward, the defendant had Gaylor get Huddleston's signature on a promissory note representing a fictitious debt of $25,000 to defendant. The insurance policy was to be security for the alleged debt. At Gaylor's prompting, Huddleston signed the note in Miller's presence, and Gaylor witnessed his signature. Two other men, M.C. Curnutt (an insurance agent and an alleged co-conspirator) and Charles Boruff, also signed as witnesses after the note's execution. The defendant also informed Gaylor that a nurse would be coming to perform a physical examination on Huddleston. The examination was performed, and an insurance policy was issued on Huddleston's life with $250,000 coverage -- $500,000 in the event of accidental death. The defendant was the sole beneficiary of this policy and furnished the money with which the premiums were paid.

Once the "paper work" had been done, the defendant offered Gaylor $10,000 to kill Huddleston. Gaylor declined because he had an obvious motive. When Miller also refused to kill Huddleston, the defendant said he would get someone else. The defendant then spoke with Phil Varnadore, one of his "men," who agreed to "get his boys to do it" for $25,000 to $50,000. After initially discussing killing Huddleston on a hunting trip, the defendant and Varnadore decided to drown him during a fishing trip, since Huddleston could not swim. Wilbur Hatmaker was designated to be the killer. Hatmaker and Miller scouted out locations for the drowning on Norris Lake, and eventually a suitable spot was located. Hatmaker instructed Miller to have Huddleston there by 8:00 p.m. the next evening.

Gaylor arranged a fishing trip with Huddleston for that day, but only Miller showed up. The two men went to Norris Lake and rented a pontoon boat. Sometime after dark, Hatmaker and John Rollyson appeared in a separate boat. Acting on the pretense they were friends of Miller, the two joined Huddleston and Miller in fishing from the pontoon boat. According to plan, Miller left to get bait in another boat he had brought on the trip. Rollyson testified that after Miller left, Hatmaker pushed the victim into the water and wiped the boat with a rag. Hatmaker had promised Rollyson $12,500 for the killing, to be paid in 90 days. (The insurance policy provided for payment in 90 days). When Miller returned to the boat, Huddleston was gone, as were Hatmaker and Rollyson. Miller reported Huddleston's disappearance and his body was discovered later that day in 15 feet of water. There were no obvious signs of violence on the body, but the pathologist later

4

noted a deep bruise in the victim's scalp behind his right ear, which was apparently caused by a blunt object -- possibly from striking his head on the boat, or being struck by a boat paddle or a fist.

The defendant and Gaylor filed claims to collect the insurance. When the company refused to pay because of the district attorney's investigation into the circumstances of the victim's death, Gaylor sued the insurance company in federal court, claiming that Hutchison was responsible for Huddleston's death and should not be awarded the insurance proceeds. Hutchison then filed a cross-claim in the federal suit.

While the defendant was incarcerated on these charges, he wrote several letters to Miller and Varnadore communicating with them about the case and tacitly urging them to keep quiet. These letters were produced at trial. The defendant's cell mate, Keith Wilson, who had forwarded some of defendant's letters to Miller, testified that the defendant had told him that the others involved "knew better than to say anything" and that "[i]f they did, they would end up the same way as the other guy." The defendant had remarked that he had the money to get something done from jail and "all he had to do [was] make a phone call." He also said that "as long as everybody kept their mouth shut, then they would be found not-guilty, they couldn't prove nothing."

The defendant maintained that the $25,000 loan and subsequent use of the insurance policy as collateral had been a legitimate business deal between Huddleston and the defendant, who had loaned money to the victim in the past. The defendant, who testified, maintained his innocence of any involvement in Huddleston's death.

Hutchison, 898 S.W.2d at 164-66 (footnote omitted).


## POST-CONVICTION EVIDENTIARY HEARING

At the post-conviction evidentiary hearing, the petitioner testified that he met with his attorneys only six times before trial. He stated that his counsel failed to call a witness who was present when the loan was made by the petitioner to the victim and a witness who was present when the promissory note was signed by a state witness. He claimed these witnesses would have discounted the state's claim that the petitioner did not lend the victim money and that the victim signed the promissory note at the petitioner's home. He also stated that counsel had failed to call three character witnesses provided by the petitioner during the penalty phase of the trial. However, the

5

petitioner admitted that these witnesses were merely business associates and he did not know what they would say.

The petitioner next cited counsel's failure to investigate his physical condition and health even though the petitioner had sustained numerous injuries due to automobile and work accidents. He testified that he had been given the drug Talwin while he was incarcerated and stated that the drug had prevented him from interacting effectively with his attorneys. He then testified that counsel had not included issues concerning prosecutorial misconduct and a constructive amendment to the indictment which he had requested be included in his appeal. He also complained that his counsel had referred to his business of loaning money as "loan sharking" numerous times during the trial.

On cross-examination, the petitioner admitted that his testimony concerning the number of times he met with counsel was purely from memory. He stated that the strategy of his lawyers had been that no murder had been committed and that the petitioner had not participated in any conspiracy. Though he complained about the effects of the drug given him while he was incarcerated, the petitioner admitted that throughout all the accidents he had previously described, he had always been able to conduct his affairs in a normal manner. Counsel for the state then asked the petitioner a series of questions concerning a series of dates he had met with his counsel, and the petitioner stated that he could not remember specific dates.

On redirect examination, the petitioner described a speech disorder of stuttering that he had experienced in his childhood, but he stated that he had never undergone any psychological or neurological testing for the disorder. He again testified that counsel had failed to call an important witness who would have testified concerning

6

the loan made to the victim. The petitioner claimed that testimony concerning his involvement with drug trafficking and other illegal activities was untrue.

One of the petitioner's trial attorneys was called as a witness. He stated that he had been practicing law since 1979, but that the petitioner's case was the first capital case in which he had been involved that went to trial. He testified that he had met with the petitioner on numerous occasions before trial. He said that he had been a candidate for public defender at the time and that he "did what I thought I was supposed to do," but in retrospect "I don't think I knew what I was doing." He stated that he should have requested the services of a sentencing consultant and a psychiatrist before trial, but he acknowledged that he had not been made aware of the petitioner's speech disorder or history of work and automobile accidents. He testified that he became aware sometime during the trial that the petitioner had been taking medication.

When questioned concerning trial preparation, counsel stated that he had studied manuals on capital case defense and jury selection and that he had been involved in a very limited capacity in the representation of a capital defendant before this case but that the case had been settled. He testified that an investigator had been hired in the petitioner's case and that someone other than himself had spoken to the person whom the petitioner claimed was present at the loan transaction. He recalled that some people the petitioner requested be called as witnesses were not called.

When questioned concerning whether he would object to testimony concerning purported illegal activities in which the petitioner was involved, counsel stated, "Whatever the record says. I can only tell you that it would be -- it would be as natural for me to object to that as it would be to appear for court." He admitted that he

7

believed evidence of other bad acts of the petitioner had been "very damning to his case."

On cross-examination, counsel testified that he did not know if a sentencing consultant or a psychiatrist would have changed the verdict in the case. He also testified that the petitioner had seemed to understand the trial proceedings and that counsel had never had an indication that the petitioner suffered from any type of physical, mental, or emotional disability. Counsel stated that he and co-counsel had developed the strategy that the petitioner had not committed the crime and had not been involved in a conspiracy of any kind. He testified that the issues that they had felt had the best likelihood of succeeding on appeal had been chosen and that the appellate brief had been in excess of one hundred pages.

The trial court then considered the petitioner's motion concerning expert services, noting that the motion had been received only that day, and the motion was overruled. The court also overruled the petitioner's motion for a continuance. Presenting no evidence, the state then moved to dismiss the petitioner's petition.

The trial court concluded that evidence concerning uncharged illegal activity of the petitioner had been objected to and ruled upon numerous times both pretrial and during trial. It recalled having found that part of the conspiracy charged had involved the illegal sale of drugs and also stated that this issue had also been determined by the Tennessee Supreme Court. In concluding that the petitioner had received the effective assistance of counsel, the trial court stated that counsel "had never missed a beat" and that counsel was in "the high range" of competence. Though it did not make specific determinations regarding the petitioner's other issues, the trial court stated that all other claims had been previously decided and properly appealed.

8

In reviewing the trial court's determinations, we are guided by certain rules. The burden was on the petitioner at the hearing to prove his case by a preponderance of the evidence.[1] On appeal, the trial court's findings are conclusive unless the evidence of record preponderates against its determinations. Turner v. State, 698 S.W.2d 90, 91 (Tenn. 1985). The burden now rests upon the petitioner to illustrate how the record preponderates against the judgment. Black v. State, 794 S.W.2d 752, 755 (Tenn. Crim. App. 1990).

## I. EFFECTIVE ASSISTANCE OF COUNSEL

The petitioner contends that his trial attorneys were ineffective for failing to object to or limit the introduction of inadmissible evidence concerning the petitioner's participation in illegal activities for which he had not been charged, for failing to object to erroneous reasonable doubt instructions, for lacking the experience and knowledge necessary for representation in death penalty cases, for failing to consult with the petitioner at crucial stages of the proceedings, for failing to request expert and investigative services, and for failing to question prospective jurors adequately regarding their ability to consider a life sentence in light of the applicable aggravating and mitigating circumstances. We hold that the petitioner received the effective assistance of counsel.

Under the Sixth Amendment, when a claim of ineffective assistance of counsel is made, the burden is upon the petitioner to show (1) that counsel's performance was deficient and (2) that the deficiency rendered a reasonable probability that the result of the trial was unreliable or the proceedings fundamentally unfair. Strickland v. Washington, 466 U.S. 668, 687, 104 S. Ct. 2052, 2064 (1984). In Baxter v. Rose, 523 S.W.2d 930, 936 (Tenn. 1975), the Tennessee Supreme Court decided that attorneys should be held to the general standard of whether services rendered

_____

[1] For post-conviction cases filed after May 10, 1995, the standard of proof required of petitioners is clear and convincing evidence. See T.C.A. § 40-30-210(f).

were within the range of competence demanded of attorneys in criminal cases. Further, the court stated that the range of competence was to be measured by the duties and criteria set forth in Beasley v. United States, 491 F.2d 687 (6th Cir. 1974) and United States v. DeCoster, 487 F.2d 1197 (D.C. Cir. 1973), cert. denied, 444 U.S. 944 (1979). Also, in reviewing counsel's conduct, a "fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." Strickland v. Washington, 466 U.S. at 689, 104 S. Ct. at 2065; see Hellard v. State, 629 S.W.2d 4, 9 (Tenn. 1982) (Counsel's conduct will not be measured by "20-20 hindsight.").

## A.

The petitioner asserts that counsel failed to file, or to obtain rulings on, pretrial motions to limit the state's presentation of evidence concerning uncharged illegal conduct of the petitioner and failed to object to its admission at trial. He cites instances where the state was allowed to make reference to or elicit testimony concerning the uncharged illegal activity of the petitioner. However, we conclude that counsel did, in fact, object to evidence concerning prior bad acts of the petitioner. In most, if not all of the instances, the petitioner's counsel attempted to object to harmful testimony, even though the trial court had concluded that all evidence proved to be in furtherance of a conspiracy, such as illegal drug activity, was admissible.

Generally, the petitioner's complaints about the state's use of illegal conduct evidence relates to the following trial events. In its opening statement, the state referred to the petitioner's relationship to the codefendant as "a man with whom he was associated in the selling of drugs." State witness Keith Miller referred to the petitioner's money as "drug money." State witness Rick Miller testified concerning a personal computer owned by the victim which had been sold by the codefendant to the

10

petitioner, and Miller detailed his involvement with the petitioner in illegal drug activity. State witness Bobby Joe Higgs identified check stubs which had been confiscated from the defendant's home, and later testimony described the checks as payments for drugs. State witness Phillip Varnadore also testified concerning illegal drug activity of the petitioner. In closing argument, the state referred to the petitioner as a "drug lord" and "ringleader" and theorized that figures from a notebook confiscated from the petitioner's home were actually calculations of returns the petitioner could "make on his drug investments."

First, we note that defense counsel's actions to block or limit use of prior bad act evidence began pretrial. At a February 1990 motion hearing, counsel for codefendant Gaylor moved that any evidence that would be brought before the jury under Rules 608 or 609, Tenn. R. Evid., be provided to the defendant ten days prior to trial. The trial court set a date requiring the state's response, and when the state failed to file the information, counsel for the codefendant and counsel for the defendant jointly filed a motion to suppress any evidence that would be brought in under these rules. The court ruled that if the state gave adequate notice two weeks before the trial date of January 7, 1991, the evidence would be admissible.

In March 1990, counsel for the petitioner filed a pretrial motion requesting that the state provide the petitioner notice of its intent to introduce any evidence of prior crimes, wrongs, or acts pursuant to Rule 404(b), Tenn. R. Evid., that were allegedly committed by the petitioner. The state responded that it intended to introduce evidence that the defendant and his codefendants were involved in a conspiracy involving the illegal sale of controlled substances, as well as insurance fraud. At that time, the state intended to use the evidence as proof of a common scheme or plan, proof of motive, proof of intent, and rebuttal of accident in this case.

11

In September 1990, the petitioner filed a motion requesting that the court order the state to provide the defendant with written notice of any impeaching conduct of the petitioner prior to trial pursuant to Rule 608(b)(3), Tenn. R. Evid. In October 1990, the petitioner requested a ruling before trial that, among other things, prohibited the state "from referring to the accused's prior or other criminal behavior or implying that the same exists unless and until it is properly introduced into evidence." Each of these pretrial motions was apparently intended to limit introduction of uncharged illegal activities.

As for the instances cited by the petitioner where the state elicited uncharged illegal acts, before Rick Miller's testimony, codefendant Gaylor's counsel moved that Miller not be allowed to make any reference to the uncharged illegal activities of either of the codefendants unless he had specific knowledge of such conduct.[2] The court ruled that it would stop the witness if he were asked a question about something of which he had no personal knowledge, but again concluded that any evidence that would support the theory of a conspiracy would be admissible.

The petitioner's counsel did not object to Miller's testimony before it was heard, but at a subsequent jury-out hearing, counsel objected to the witness' testimony concerning a discussion between the codefendant and the defendant, claiming that it was being introduced as co-conspirator hearsay before it had been determined that a conspiracy existed. The objection was overruled on grounds that a trial court may allow co-conspirator hearsay to be introduced before it makes a determination that a conspiracy exists if the hearsay is evidence of the conspiracy and is corroborated at a later time.

---

[2] The record reflects that evidentiary objections by the codefendant were also attributable to the petitioner.

The petitioner's counsel also moved to supress certain evidence admitted through witness Bobby Joe Higgs, a detective with the Anderson County Sheriff's Department. He testified that he had gone to the petitioner's home with a search warrant and had confiscated numerous check stubs and a notebook which contained insurance papers. These stubs were later identified by witness and co-conspirator Phillip Varnadore as payments for drugs. Before trial, however, counsel for the petitioner had filed a motion to suppress all evidence seized from the petitioner's residence due to a violation of the petitioner's Fourth Amendment rights under the United State's Constitution. The motion was overruled.

Before Varnadore testified, defense counsel objected to certain letters written by the petitioner to Varnadore on the basis that they had only been provided to defense counsel the weekend before the trial. The letters were incriminating as they discussed certain money paid to individuals for drugs. The objection was overruled, and the letters were admitted and read to the jury.

On numerous occasions during opening and closing argument, the state referred to the conspiracy of all the codefendants and their involvement in illegal drug activity in furtherance of the conspiracy. However, given that the court had already concluded that evidence of acts in furtherance of the conspiracy was admissible, any objection to the argument would have been fruitless.

The petitioner next claims that trial counsel was ineffective for eliciting evidence of the petitioner's illegal activities. He refers to the cross-examination of state witness Ricky Miller wherein counsel purportedly elicited testimony that the petitioner had loaned the witness money for a boat but that there had been an agreement that after the witness had the boat for awhile, "it was to be burned and [the witness would] collect the insurance on the boat." However, the record reveals that the testimony of

13

Miller concerning the proposed insurance scam was not elicited by counsel. Rather, this testimony appeared to be a surprise to counsel as shown by his next question to Miller, "You just want to add that to your testimony today." Counsel was apparently attempting to impeach Miller's testimony by showing that he owed the petitioner money when this comment was made by the witness.

The petitioner also faults counsel for eliciting testimony from the petitioner concerning two revocations of a security clearance the petitioner had experienced while previously employed. However, testimony concerning the security clearance was actually elicited to show that the petitioner had maintained a "Q" clearance for nine years and six months while employed by Martin-Marietta. The petitioner explained that a "Q" clearance means that a person has an "unblemished record, no drugs, no felonies, pretty much an upright person." He admitted that his clearance had been revoked twice for an arson charge and a football board, but stated that after an investigation, he was found not guilty of the charges and his clearance was reinstated.

Counsel also questioned the petitioner about illegal drug activity in an apparent effort to rebut all prior testimony of the state's witnesses concerning illegal drug activity. The petitioner emphatically denied any participation in illegal drug activity, but the state used this testimony to argue that the petitioner had "opened the door" to cross-examination on this subject.

The petitioner also claims that counsel was ineffective for failing to object to the cross-examination of the petitioner. This is not supported by the record. Before cross-examination, the state argued that it should be able to cross-examine the petitioner concerning pending charges of fraudulent credit card use, the possession of illegal drugs, and receiving and concealing stolen property. The state argued that the prior bad acts should be admissible to impeach the petitioner and that evidence of drug

14

activity should be allowed because the petitioner had earlier denied any illegal drug activity. The state then argued that part of its case was that the codefendants conspired and associated in part because of the drug transactions between them. Counsel for the petitioner objected to this cross-examination based upon the fact that the alleged conduct concerning the credit card and stolen property occurred after the offense on trial occurred. Counsel also objected to the prejudicial effect of any testimony concerning drug activity. The court overruled counsel's objections and held that cross-examination concerning these activities was admissible. Thus, the record reflects that counsel did object.

Last, the petitioner claims that counsel was ineffective for failing to object to inadmissible evidence and improper argument made during the sentencing phase of the trial, primarily dealing with the state's claim of the petitioner's illegal drug activity. The complaint about evidence relates to the state relying in the sentencing phase on the evidence presented at the guilt phase of the trial, which included the evidence of illegal drug activity. This evidence is also at the root of the arguments about which the petitioner now complains.

During argument, in response to the petitioner's argument that he had no history of prior criminal activity, the prosecutor stated that the record was "chock full of criminal activity." In response to the petitioner's argument that he was a skilled worker, the prosecutor commented that because the petitioner was a skilled worker, it was not necessary for him to sell drugs to make a living. The prosecutor also referred to the petitioner as the ringleader in the conspiracy to sell drugs and commit murder for hire. He stated that it had been Rick Miller's testimony that the insurance proceeds that were the goal of the crime would be used by the petitioner to invest in more drugs. The petitioner asserts that this last remark was a misstatement of the evidence and that all

of the remarks were not proper subjects for consideration by the jury pursuant to T.C.A. § 39-2-203(c) (1982).[3]

As a starting point, we note that trial counsel was not questioned at the evidentiary hearing about the closing arguments in the sentencing phase. The record contains no indication of the circumstances or counsel's thinking at the time of the argument that would shed any light on the lack of objections. With the burden being upon the petitioner to prove his claims, we will not presume deficient performance by counsel from such lack of evidence. Rather, it would only be the most egregious error from which we could conclude that no competent lawyer would forego objection that would allow us to conclude that failure to object was not a legitimate tactic. See, e.g., State v. Ogle, 666 S.W.2d 58, 60-61 (Tenn. 1984).

In Cozzolino v. State, 584 S.W. 2d 765 (Tenn. 1979), over the defendant's objections, the state introduced in the sentencing phase evidence of statements by the defendant in which he admitted committing a number of armed robberies during the interval between the murder for which he was on trial and his arrest. In holding that the admission of the statements was error, our supreme court dealt with T.C.A. § 39-2404(c), a provision almost identical to T.C.A. § 39-2-203(c) (1982):

> On its face section (c) would seem to permit the introduction of evidence "relevant to the punishment" in addition to that "tending to establish or rebut the aggravating circumstances" or "tending to establish or rebut any mitigating factors." However, this interpretation is one that we cannot accept. When the statute is considered as a whole, it is clear that the only issues that the jury may properly consider in reaching a decision on the sentence to be imposed are whether the State has established one or more of the aggravating circumstances beyond a reasonable doubt and, if so, whether any mitigating factors have been shown that would outweigh those aggravating circumstances. Any evidence that does not go to

---

[3] In pertinent part, T.C.A. § 39-2-203(c) (1982) (now codified at T.C.A. § 39-13-204(c) (1990 and Supp. 1996)), states: "In the sentencing proceeding, evidence may be presented as to any matter that the court deems relevant to the punishment and may include, but not be limited to, the nature and circumstances of the crime; the defendant's character, background history, and physical condition; any evidence tending to establish or rebut the aggravating circumstances enumerated in subsection (i); and any evidence tending to establish or rebut any mitigating factors . . . ."

the proof of one or the other of those issues is irrelevant to the jury's deliberation. We cannot believe that the legislature intended that irrelevant evidence be placed before the jury, fraught as such a procedure would be with the 'substantial risk that [the death penalty] would be inflicted in an arbitrary and capricious manner,' Gregg v. Georgia, 428 U.S. 153, 188, 96 S. Ct. 2909, 2932, 49 L.Ed.2d 859 (1976), i.e., on the basis of factors other than those deemed by the legislature to be proper predicates for the sentencing determination. We think that a better interpretation of T.C.A. § 39-2404(c), and one more in keeping with both the sense of the entire statute and the mandate of the United Supreme Court, see, e.g., Gregg v. Georgia, supra; Lockett v. Ohio, 438 U.S. 586, 98 S. Ct. 2945, 57 L.Ed.2d 973 (1978), is that evidence is relevant to the punishment, and thus admissible, only if it is relevant to an aggravating circumstance, or to a mitigating factor raised by the defendant.

Cozzolino, 584 S.W.2d at 767-68.

In the present case, the petitioner relied upon T.C.A. § 39-13-204(j)(1), that "the defendant has no significant history of prior criminal activity," as a mitigating circumstance. The prosecutor's comment that the record was "chock full of criminal activity" was relevant to rebut the use of this mitigator.

The petitioner offered as a nonstatutory mitigator that he was a skilled worker and could "be counted upon to do a good job for the Tennessee Department of Correction." The prosecutor's response that it was not necessary for the petitioner to sell drugs because he was a skilled worker does not actually rebut this mitigator. However, even if we were to conclude that the response was improper, we cannot conclude that counsel's failure to object to it was deficient performance that materially prejudiced the petitioner, given the substantial evidence of illegal drug activity that was already before the jury.

The petitioner also faults counsel for failing to object to the state's argument that he was using the insurance proceeds from the murder for hire to invest in drugs, referring to Rick Miller's testimony. The petitioner states that Miller did not so testify and he argues that it was prosecutorial misconduct to argue this unproven claim

17

of criminal intent, particularly as a reason for imposing the death penalty.  First, although the record reflects that evidence of reinvestment of the insurance proceeds was not introduced through Rick Miller, it does contain evidence of handwritten notations on insurance forms which, according to the state, were calculations of money that could be made if the petitioner reinvested the insurance proceeds in drug activity.  In this sense, although Miller was not the source, there remained an evidentiary basis for the state's argument.

What is less clear is whether the state's position about the petitioner's drug dealings, specifically about investing insurance proceeds into the illegal drug business, was improperly argued in the context of reasons to impose the death penalty, as opposed to rebuttal to the petitioner's claim of a lack of criminal history.  In the state's closing argument, the prosecutor presented an item by item rebuttal to the petitioner's and codefendant's claimed points in mitigation.

However, this rebuttal argument was followed by the state's concluding remarks, which included the following:

> Mr. Hutchison, he who puts together a murder for hire, is a particularly evil force.  He is one with a wicked and depraved heart who would end a life for money.  From the evidence in this case, it is clear that it was greed, greed on the part of both [the codefendant] and Hutchison.  Greed for money; money to party, money to pamper girlfriends that they swapped around, money to invest in drugs that could be distributed in larger quantities, to more customers, destroy more young people, but making you as the ringleader of this an even greater return on your investment.
>
> You remember Rick Miller's testimony that not only did Mr. Hutchison intend to collect this five hundred thousand dollars from the death of Hugh Huddleston, but he intended to increase that even more by investing it in drugs.  And indeed, at the very time that the money would've come in, he was engaged in cocaine trafficking.

18

The defendant contends that this argument was an attempt by the state to get the jury to impose the death penalty because of the drug trafficking, not any statutorily required aggravating circumstances.

We tend to agree that the reference to the petitioner's intent to invest the crime proceeds into more drugs that would "destroy more young people" has the potential to focus the jury unduly on concerns about the petitioner's drug dealings. However, in reviewing the complete closing remarks, we believe that the major thrust of the state's comments focused consideration on the petitioner's financial motives for the murder. Obviously, the nature and circumstances surrounding the murder, particularly the financial reasons that motivated it, were relevant to the aggravating circumstance regarding murder for remuneration that was presented to the jury. In this sense, to the extent that the evidence supported a conclusion that a major reason for the killing was to have funds to invest in drug trafficking, the prosecutor's argument was proper. Otherwise, we believe that the "offending" reference was not sufficiently significant that the failure to object was deficient performance that prejudiced the petitioner.

In sum, from our review of the trial record, we conclude that counsel did, in fact, make a diligent effort to exclude from the evidence testimony concerning uncharged illegal acts despite the fact that most, if not all, the evidence had been deemed admissible. Counsel's performance did not constitute the ineffective assistance of counsel.

## B.

The petitioner next contends that counsel was ineffective for not objecting to the reasonable doubt jury instruction at both the guilt and penalty phase of the trial. The instruction given during the guilt phase reads as follows:

> Reasonable doubt is that doubt engendered by an investigation of all the proof in the case and an inability after

19

such investigation, to let the mind rest easily as to the certainty of guilt. Reasonable doubt does not mean a captious, possible, or imaginary doubt. Absolute certainty of guilt is not demanded by the law to convict of any criminal charge, but moral certainty is required and this certainty is required as to every proposition of proof requisite to constitute the offense.

A similar instruction was given at the penalty phase:

The burden of proof is upon the State to prove any statutory aggravating circumstance or circumstances beyond a reasonable doubt and to a moral certainty. Reasonable doubt is that doubt engendered by an investigation of all the proof in the case and an inability, after such investigation, to let the mind rest easily upon the certainty of your verdict. Reasonable doubt does not mean a doubt that may arise from possibility. Absolute certainty is not demanded by the law, but moral certainty is required and this certainty is required as to every proposition of proof requisite to constitute the verdict.

The petitioner asserts that counsel should have objected to these instructions because the linking of the phrase "reasonable doubt" to "moral certainty" is unconstitutional, citing Rickman v. Dutton, 864 F. Supp. 686 (M.D. Tenn. 1994), in support of his claim.

On numerous occasions, Tennessee courts have held that the identical or similar instructions were consistent with constitutional principles. See, e.g., State v. Nichols, 877 S.W.2d 722, 734 (Tenn.1994); Pettyjohn v. State, 885 S.W.2d 364, 365 (Tenn. Crim. App. 1994). We do not believe that counsel's failure to object constituted deficient performance.

## C.

The petitioner claims that trial counsel lacked the experience and knowledge necessary for effective representation in a death penalty case and failed to investigate and present evidence to demonstrate aspects of his character, background, and mental state. However, other than referring to his other claims about the ineffectiveness of counsel, the petitioner does not demonstrate that counsel was inexperienced and unknowing and that this inexperience prejudiced him.

20

At the post-conviction hearing, only one of the petitioner's trial counsel testified. He stated that he had been practicing law for twelve years at the time of this trial and that he had previously worked on another capital case that had settled before trial. When questioned about the petitioner's background, counsel stated that he had not been aware of the petitioner's stuttering problem nor any head injuries resulting from automobile accidents. He acknowledged that he had known that the petitioner had been placed on pain medication during the pendency of the case, but he denied having any indication that the petitioner was not comprehending what was being said to him.

Counsel also stated that one of the witnesses the petitioner wanted to call, Mike Bell, had been interviewed by co-counsel for approximately three hours. He acknowledged that Bell had not been called as a witness and that he had no recollection as to why the witness had not been called. As for other witnesses who would have vouched for the petitioner's character, counsel testified that during the penalty phase of the trial, he had put on numerous character witnesses who testified concerning the petitioner's background.

When a petitioner contends that counsel failed to present witnesses in support of his defense, these witnesses should be presented by the petitioner at the evidentiary hearing. By presenting them, the petitioner can establish that the failure to have a known witness testify resulted in the denial of evidence material to the petitioner. See State v. Black, 794 S.W.2d 752, 757 (Tenn. Crim. App. 1990).

However, in this case, the petitioner did not present Mr. Bell or any other witness that he would have his trial counsel introduce on his behalf. Under these circumstances, the trial court had insufficient evidence to determine either if the failure to call a witness was deficient performance by trial counsel or if such failure constituted

21

material prejudice to the petitioner's cause. Accordingly, the petitioner has failed to show that the trial counsel's claimed failures amounted to the ineffective assistance of counsel.

## D.

The petitioner claims that counsel was ineffective in failing to consult with the petitioner throughout the proceedings. The petitioner testified that he met with counsel only six times before trial. However, the fee claims of counsel reveal that one attorney met with the petitioner twenty times and the other attorney met with him seven times. Numerous telephone calls were also made to the petitioner.

The petitioner asserts that he could not effectively interact with his attorneys because he was given pain medication every four hours while he was incarcerated. However, the petitioner admitted that he had been able to provide counsel with a witness list and specific details concerning his relationship with the co-conspirators and the alleged loan transaction between him and the victim. The trial record reflects that the jury was provided with a detailed explanation of the petitioner's version of the events. Undeniably, this record could not have been created if counsel had not consulted extensively with the petitioner. Counsel's performance was not deficient in this regard.

The petitioner also claims that counsel failed to discuss with him the issues that would be raised on appeal. However, counsel testified that he and co-counsel had met with the petitioner to discuss the appeal and that they had talked in a general manner. He stated that they had used the motion for a new trial as a backdrop for the issues. The trial court obviously accredited the testimony of trial counsel.

22

As for specific issues to be raised on appeal, counsel stated that he and co-counsel had chosen only the issues that they felt had the best chance of succeeding. He also stated that their brief had been in excess of one hundred pages. We also note that the petitioner fails to identify in his brief any substantive issue that should have been raised but was not.

An advocate is not required to raise every issue contained in the motion for a new trial or requested by the accused. Jones v. Barnes, 463 U.S. 745, 750-51, 103 S. Ct. 3308, 3312 (1983); State v. Swanson, 680 S.W.2d 487, 491 (Tenn. Crim. App. 1984). The determination of which issues to present on appeal is "a matter which addresses itself to the professional judgment and sound discretion of the appellate counsel." Cooper v. State, 849 S.W.2d 744, 747 (Tenn. 1993). Counsel's performance was not deficient in selecting appropriate issues for appeal.

**E.**

The petitioner argues that counsel was ineffective for failing to secure expert services. Although trial counsel testified that in retrospect, he would have used the services of a sentencing consultant and a psychiatrist, he acknowledged that he presented several witnesses who testified about the petitioner's background. He stated that he did not know if the use of experts would have changed the verdict in this case.

The record reveals that an investigator was employed by counsel and that between counsel and the investigator, more than one hundred and eighty-eight hours were spent in investigation. At the sentencing phase of the trial, seven witnesses were extensively questioned concerning the petitioner's background and character. Thus, many of the particulars about the petitioner's background and character that he claims would have been shown by expert testimony were in fact proven by other witnesses.

23

We recognize that background and character are considered relevant to a capital sentencing determination "because of the belief, long held by this society, that defendants who commit criminal acts that are attributable to a disadvantaged background, or to emotional and mental problems, may be less culpable than defendants who have no such excuse." California v. Brown, 479 U.S. 538, 545, 107 S. Ct. 837, 841 (1987) (O'Connor, J., concurring). Also, we recognize that mental condition experts can be important to aid jurors to make sensible and educated determinations about an accused's mental condition that is relevant to the issues on trial. See Ake v. Oklahoma, 470 U.S. 68, 80-81, 105 S. Ct. 1087, 1094-95 (1985). However, this does not mean that counsel will be performing deficiently, per se, by electing to use lay instead of expert witnesses. We will not fault the attorneys' reliance in this case upon lay witnesses to show the petitioner's background, positive qualities, and rehabilitation attempts. According to counsel, the petitioner had never indicated that he suffered from any type of physical, mental or emotional disability that would have warranted the services of a psychiatrist. Also, the investigation of the petitioner's background by counsel and the investigator was shown to be extensive.

**F.**

Last, the petitioner claims counsel was ineffective for failing to question prospective jurors adequately about their ability to consider a life sentence if an aggravating circumstance was found. However, trial counsel was not questioned at the evidentiary hearing about voir dire. And the petitioner gives no explanation as to how counsel could have more effectively questioned the jurors.

The trial record reveals that the jury voir dire was extensive. Prospective jurors were questioned repeatedly by the trial court, the state, counsel, and counsel for the codefendant regarding their ability to consider life or death if the defendants were found guilty of murder. They were also asked if they would be able to follow the law.

24

We see no evident indication that the jury was less than fair or impartial or that counsel's jury selection activities constituted deficient performance. There is no merit to this issue.

## II. EVIDENCE CONCERNING UNCHARGED ILLEGAL ACTIVITIES

The petitioner claims that he was denied due process of law by the misconduct of the state in its introduction of inadmissible evidence and improper arguments concerning the petitioner's participation in illegal activities for which he had not been charged. Specifically, he asserts that testimony was elicited from witnesses concerning the petitioner's illegal drug activity and concealment of stolen property. He also contests the state's arguments made at both phases of the trial in which the prosecutor repeatedly referred to illegal drug activity of the petitioner.

As we have previously acknowledged, the trial court ruled that the state could question the petitioner and other named co-conspirators in this case concerning the drug relationship between them. We agree that the testimony concerning illegal drug activity would be admissible because the conspiracy to commit murder was linked to the prior relationship among the co-conspirators based upon their involvement in the drug business. Therefore, the state's introduction of evidence and related argument concerning this activity was not improper.

## III. TRIAL COURT'S FAILURE TO MAKE WRITTEN FINDINGS OF FACT

The petitioner argues that the trial court erred in failing to enter a written order or memorandum on all grounds presented in the petition for post-conviction relief. The state concedes that the trial court should have addressed each claim made by the petitioner, but it does not agree that the failure to do so warrants reversal of the trial court's judgment.

25

Pursuant to T.C.A. § 40-30-118(b), the trial court must set forth all grounds presented and state findings of fact and conclusions of law with regard to each ground. However, even if a trial court fails to comply with this duty, a reversal is not warranted if the record reflects the reasons for the trial court's actions. State v. Swanson, 680 S.W.2d at 489. In Swanson, this court stated that the primary intent of the statute was "to facilitate appellate review of the lower court's proceedings . . . ." Id. If the record contains the reasons for the trial court's action "sufficient to effectuate meaningful appellate review," then we may consider the issues, even though there has not been full compliance with T.C.A. § 40-30-118(b). Id. Such a record exists in this case and a remand for further findings is unnecessary.

## IV. FUNDS TO RETAIN EXPERT SERVICES

The petitioner claims that the trial court erred in refusing to grant him funds to retain expert services. The petitioner requested authorization for the following investigative and expert services:

> 1. Marjorie Fargo, Senior Trial Consultant and President of Jury Services - funds in the amount of $3,000 for jury investigation.
>
> 2. Frank H. Einstein, Ph.D., sentencing consultant and mitigation specialist - funds in the amount of $9,000 to conduct an analysis of the proof submitted at the penalty phase of the trial.
>
> 3. Charles T. Kenny, Kenny and Associates - funds in the amount of $2,000 to compile census data and perform a statical analysis to resolve any issues concerning the composition of the jury panel and ultimate venire.
>
> 4. Dr. Peter Young, clinical psychologist - funds in the amount of $6,000 to evaluate the petitioner to determine his level of psychological functioning and ability at the time of the offense.

The trial court reserved ruling on the petitioner's motion pending his presentation of proof. In its written order entered September 27, 1995, the court concluded that the petitioner's proof did not establish that the requested expert services were required to prove a constitutional infringement, that the services could only assist in searching for

26

possible constitutional infringements, and that the petitioner had failed to demonstrate a need for the requested services.

In Owens v. State, 908 S.W.2d 923 (Tenn. 1995), the Tennessee Supreme Court ruled that the ex parte provisions of T.C.A. § 40-14-207(b), which provides for the authorization of expert services, are to apply in post-conviction capital cases. 908 S.W.2d at 928.[4] The court held that to obtain an ex parte hearing, a capital post-conviction petitioner must submit a written motion to the trial court alleging why state-funded services are necessary to ensure due process is afforded under the particular facts and circumstances of the case. Id. The motion must also include the following: "(a) the name of the proposed expert or service; (b) how, when and where the examination is to be conducted or the services are to be performed; (c) the cost of the evaluation and report thereof; and (d) the cost of any other necessary services, such as court appearances." Id.; see also Tennessee Supreme Court Rule 13 § (2)(B)(10).

However, the court cautioned that its application of T.C.A. § 40-14-207(b) to post-conviction capital cases "should not be interpreted as a 'blank check' requiring trial judges to hold ex parte hearings and authorize funds in every case." Owens, 908 S.W.2d at 928. In order to receive state funding of expert services, the petitioner must demonstrate that the "services are necessary to ensure the protection of the petitioner's constitutional rights." Id. As the court explained, "a petitioner must demonstrate by specific factual proof that the services of an expert or an investigator are necessary to establish a ground for post-conviction relief, and that the petitioner is unable to establish that ground for post-conviction relief by any other available evidence." Id.

The discretion to grant a request for expert services rests with the trial court and its decision will not be reversed on appeal unless there is a clear showing of

---

[4] As noted by the parties, the post-conviction court's ruling in this case preceded the Tennessee Supreme Court's decision in Owens.

an abuse of that discretion. State v. Cazes, 875 S.W.2d 253, 261 (Tenn. 1994). In the written motion submitted by the petitioner, he failed to specify by factual proof that the services of an expert or investigator were necessary to establish a ground for post-conviction relief and that he was unable to establish such ground by other available evidence. We conclude that the trial court acted within its discretion in denying the requested services.

## V. DENIAL OF A CONTINUANCE

The petitioner contends that the trial court erred in denying him a continuance. The record reveals that counsel for the petitioner was appointed on May 11, 1995. The record indicates that the evidentiary hearing was originally scheduled for September 14, 1995, but a continuance was granted. The petitioner requested a second continuance on September 8, 1995, and renewed the request on September 27, the date of the hearing.

The petitioner argued to the trial court that additional time was needed in order to receive a response concerning the open records request made concerning files pertaining to this case, a decision rendered on his Petition for Writ of Certiorari pending in the United States Supreme Court concerning jury instructions in this case, and a decision pending in the Tennessee Supreme Court in the matters of Owens v. State and House v. State concerning the availability of expert services. He further averred that additional time was needed for investigation. The trial court denied the request, concluding that the continuance was neither appropriate nor required.

The decision whether to grant a continuance rests within the discretion of the trial court. State v. Morgan, 825 S.W.2d 113, 117 (Tenn. Crim. App. 1991). The denial of a continuance will not be disturbed "unless it appears upon the face of the record that the trial judge abused his discretion and prejudice enured to the accused as

28

a direct result of the trial judge's ruling." State v. Dykes, 803 S.W.2d 250, 257 (Tenn. Crim. App. 1990).

In May 1995, the petitioner, with the assistance of counsel from the Capital Case Resource Center, filed a pro se petition for post-conviction relief. Counsel was immediately appointed to represent the petitioner. Amendments to the petition were filed, and the evidentiary hearing was held on September 27, 1995. Thus, counsel had access to the records in this case for a substantial time.

Moreover, the petitioner has failed to show that he has been prejudiced in any manner. It is undisputed that a continuance may be granted for the purpose of securing the presence of identifiable witnesses if the witnesses' testimony is material and admissible. However, in this case, the petitioner sought a continuance to await the decisions of other courts and to gather information which, at the time of the motion, was largely unknown and of speculative value. We conclude that the trial court acted within its discretion by denying the motion for a continuance.

## VI. TRANSCRIPT OF THE ARGUMENTS OF COUNSEL AT TRIAL

The petitioner asserts that the trial court erred in failing to order the state to prepare and file transcripts of the arguments of counsel during the guilt and sentencing phases of the petitioner's trial. However, the state asserts that the record does not support this claim.

In anticipation of this proceeding, the state filed a copy of the record as it existed on direct appeal. At a September 8, 1995, motion hearing, counsel for the petitioner moved that he be allowed to supplement the record with tapes of the opening and closing arguments of the state at both the guilt and penalty phases of the trial. The trial court offered to provide copies of the tape but stated that the clerk's office might

29

not be able to get the tapes transcribed in time. Counsel for the petitioner then offered to have the tapes transcribed, admitting that after listening to them, he might not want them transcribed. Ultimately, the transcripts were entered into evidence at the post-conviction hearing.

The petitioner complains that the transcription burden was wrongly placed upon him instead of the state. We essentially agree with him in that the district attorney general is obligated to file records or transcripts that are material to the issues raised in a post-conviction petition. See T.C.A. § 40-30-114(b). However, the petitioner appeared to have accepted the burden, and in any event, he has shown no harm to his case arising from what occurred.

## VII. CUMULATIVE ERRORS

The petitioner asserts that the cumulative effect of all errors of a constitutional dimension at trial and on appeal warrant him relief. However, because we have concluded that no individual constitutional error exists, there is no improper cumulative impact upon the petitioner. This issue is without merit.

In consideration of the foregoing and the records of the petitioner's original trial, direct appeal and post-conviction proceeding, we conclude that the trial court's determinations in this case were correct. The judgment is affirmed.

_____
Joseph M. Tipton, Judge

CONCUR:


_____
Gary R. Wade, Judge


_____
William M. Barker, Judge

31