### EX PARTE Julius Jerome MURPHY, Applicant

### NO. WR-38,198-04

Court of Criminal Appeals of Texas.

Filed: June 15, 2016

Jaclyn Lee Dilauro, Katherine Marshall Ali, Elizabeth C. Lockwood, E. Desomond Hogan, Catherine E. Stetson, Hogan Lovells LLP, Washington, DC, Sarah Cummings, Norton Rose Fulbright US LLP, Dallas, for Applicant.

Jerry Rochelle, District Attorney, Texarkana, Lisa C. McMinn, State's Attorney, Austin, for the State.

### CONCURRING AND DISSENTING OPINION

Alcala, J., filed a concurring and dissenting opinion.

I respectfully concur in this Court's remand order, and I part with this Court solely with respect to the scope of the matters to be addressed on remand. Rather than limit the scope of the remand hearing to the alleged *Brady* and due-process violations based on the State's use of false evidence,[1] I would additionally authorize the trial court to address the remaining constitutional issues in this case. In suggesting that the time has come for this Court to reconsider whether the death penalty remains a constitutionally acceptable form of punishment under the current Texas scheme, the subsequent application for a post-conviction writ of habeas corpus filed by Julius Jerome Murphy, applicant, presents facial and as-applied constitutional challenges to his death sentence. I would more broadly permit applicant on remand to litigate his constitutional chal-

---

1. *See Brady v. Maryland,* 373 U.S. 83, 87, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963); *Ex parte Weinstein,* 421 S.W.3d 656 (Tex.Crim.App. 2014)

lenges to his death sentence along with the other matters included in this Court's majority remand order. For these reasons, I concur in part and dissent in part to the Court's order in this case.

## I. Background Overview of the Texas Death–Penalty Scheme

To better understand applicant's complaints in context, I give a brief overview of the Texas capital-murder scheme that broadly permits people to be convicted of capital murder and that has resulted in few reversals for insufficient evidence as to the special issues that elevate a sentence from life in prison to the death penalty.

The capital-murder statute provides for around one hundred different ways that a person can be convicted of capital murder. TEX. PENAL CODE §§ 12.31, 19.03.[2] The list of ways in which a person may commit capital murder is twice as long when one considers that a defendant may be convicted not only as a principal actor, but also as a party by, for example, aiding or attempting to aid another person to commit the offense. *Id.* § 7.02(a). And the list is thrice as long when one considers that a defendant may be convicted of capital murder even if he lacked any intent to commit that offense but was part of a conspiracy to commit a felony under certain circumstances. *Id.* § 7.02(b).

If a defendant is convicted of any of these approximately three hundred ways that a capital murder can be committed in Texas, the default sentence is life imprisonment, unless the jury unanimously answers special issues in a manner that requires the trial court to impose a death sentence. *See* TEX.CODE CRIM. PROC. art. 37.071, §§ 1, 2(g). The class of capital-murder defendants subject to the death

penalty is statutorily narrowed by the special issues presented to the jury during the punishment phase of the trial. *See id.* § 2(b), (e)(1). At a separate punishment hearing following the jury's determination of guilt, the State and the defense each present evidence relevant to the sentence. *Id.* § 2(a)(1). Then, the trial court asks the jury whether the State proved the following beyond a reasonable doubt: (1) there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society; and (2) in cases in which the jury charge at the guilt-or-innocence phase permitted the jury to find the defendant guilty as a party, the defendant actually caused the death of the deceased or did not actually cause the death of the deceased but intended to kill the deceased or another or anticipated that a human life would be taken. *Id.* § 2(b). If the jury returns an affirmative finding on each of the two special issues described above, then it must additionally answer whether, taking into consideration all of the evidence, including the circumstances of the offense, the defendant's character and background, and the personal moral culpability of the defendant, there is a sufficient mitigating circumstance or circumstances to warrant that a sentence of life imprisonment without parole rather than a death sentence be imposed. *Id.* § (2)(e)(1). Even if a jury answers these three questions in such a way that the trial court is required to impose a death sentence, the federal Constitution prohibits the execution of someone who is intellectually disabled or who was under the age of eighteen when he committed the offense. *See Atkins v. Virginia,* 536 U.S. 304, 321, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002); *Roper*

---

**2.** I have listed each of these ways of committing capital murder individually in Appendix A.

*v. Simmons,* 543 U.S. 551, 578–79, 125 S.Ct. 1183, 161 L:Ed.2d 1 (2005).

On direct appeal from a death sentence, this Court will address a sufficiency-of-the-evidence challenge to the jury's finding on the special issue that asks whether a defendant is a future danger but, in the last fifteen years, all of those challenges have been universally rejected except for in one case almost a decade ago. *See Berry v. State,* 233 S.W.3d 847, 863–64 (Tex.Crim. App.2007) (holding the evidence insufficient for a finding of future dangerousness where the defendant had been a danger only to her own children and was unlikely to have any more children while serving a life sentence in prison).[3] This Court has refused to limit a jury's consideration of whether a defendant is a future danger to society to consideration solely of his behavior in prison, even when the only alternative to a death sentence is a sentence of life in prison without parole. *See id.* The future-dangerousness special issue, therefore, permits a jury to consider whether a defendant would be a future danger in the free world even if there is no chance, short of an escape from prison or reversal of the death sentence, that he will ever live there again. *See id.* On a handful of occasions, however, this Court has reversed for evidentiary errors pertaining to the future-dangerousness special issue.[4]

Under circumstances in which a defendant has been convicted of capital murder as a party to an offense, this Court also permits sufficiency reviews of the jury's finding on the special issue that asks whether the defendant intended to kill the deceased or anticipated that death would occur. But in the past fifteen years, this Court has never reversed due to lack of evidence on this issue.

**3.** In the 1980s and, to a lesser extent, the 1990s, this Court actively reviewed jury findings of future dangerousness and occasionally reformed the punishment from death to life imprisonment due to insufficient evidence on the future-dangerousness special issue. *See, e.g., Smith v. State,* 779 S.W.2d 417, 419 (Tex. Crim.App.1989) (holding the evidence insufficient to support a finding of future dangerousness); *Huffman v. State,* 746 S.W.2d 212, 225 (Tex.Crim.App.1988) (same); *Keeton v. State,* 724 S.W.2d 58, 64 (Tex.Crim.App.1987) (same); *Ellason v. State,* 815 S.W.2d 656, 664 (Tex.Crim.App.1991) (same); *Marras v. State,* 741 S.W.2d 395 (Tex.Crim.App.1987) (same); *Beltran v. State,* 728 S.W.2d 382, 390 (Tex. Crim.App.1987) (same); *Roney v. State,* 632 S.W.2d 598, 603 (Tex.Crim.App.1982) (same); *Brasfield v. State,* 600 S.W.2d 288, 294 (Tex. Crim.App.1980) (same).

**4.** In the past fifteen years, there have been five cases in which this Court reversed and remanded for a new punishment hearing due to error in the finding of future dangerousness other than a lack of sufficient evidence. *See Olsen v. State,* No. AP–76,175, 2012 WL 1438475 (Tex.Crim.App. Apr. 25, 2012) (new punishment hearing required where defendant's expert testimony was wrongly excluded); *Estrada v. State,* 313 S.W.3d 274, 288 (Tex.Crim.App.2010) (new hearing required where erroneous testimony regarding the defendant's potential security status within TDCJ was admitted at the punishment phase); *Renteria v. State,* 206 S.W.3d 689, 698 (Tex. Crim.App.2006) (new punishment hearing required where defendant was prevented from presenting evidence to show that he was remorseful, and State's assertion of future dangerousness rested on expert testimony that defendant felt no remorse); *Russeau v. State,* 171 S.W.3d 871, 881 (Tex.Crim.App.2005) (inadmissible hearsay to show future dangerousness during the punishment phase was not harmless and required a new punishment hearing); *Thompson v. State,* 93 S.W.3d 16, 29 (Tex.Crim.App.2001) (new punishment hearing required when State used tape-recorded conversation between defendant and undercover police officer to show future dangerousness, violating defendant's Sixth Amendment right to counsel); *Davis v. State,* No. AP–74,393, 2007 WL 1704071, at *9 (Tex. Crim.App. June 13, 2007) (new punishment hearing required where trial court erroneously excluded defendant's lay-witness testimony on issue of future dangerousness).

This Court does not permit legal sufficiency reviews of the jury's finding on the mitigation special issue. *See Allen v. State*, 108 S.W.3d 281, 285 (Tex.Crim.App. 2003), *cert. denied, Allen v. Texas*, 540 U.S. 1185, 124 S.Ct. 1405, 158 L.Ed.2d 90 (2004) (holding that jury's determination of mitigating circumstances is not subject to appellate review).[5] This Court, however, has reversed death sentences for evidentiary errors affecting this special issue. *Penry v. State*, 178 S.W.3d 782, 787–88 (Tex.Crim.App.2005) (remanding for new punishment hearing where jury charge impermissibly limited evidence that jury could consider in mitigation).

Even if he qualifies for a death sentence based on the jury's finding of guilt and its answers to the special issues, a defendant who is intellectually disabled is ineligible for the death penalty. *See Atkins*, 536 U.S. at 321, 122 S.Ct. 2242. But because the Supreme Court left the standard for determining who is intellectually disabled up to the states, and because the Texas Legislature has not set forth a standard for courts to apply, this Court judicially created a standard in *Ex parte Briseno*, 135 S.W.3d 1, 8 (Tex.Crim.App.2004). I have written separate opinions urging this Court to revisit that holding, which I conclude misapplies Supreme Court law on intellectual disability. *See Ex parte Moore*, 470 S.W.3d 481, 529 (Tex.Crim. App.2015) (Alcala, J., dissenting).[6] The

---

**5.** This Court has upheld death sentences even when no proper mitigation instruction was given, despite the Supreme Court's requirement for that type of instruction, which is another problem I have written separately to illuminate. *See Ex parte Hughes*, No. AP–76,869, 2012 WL 3848404 (Tex.Crim.App. Aug. 29, 2012) (Alcala, J., concurring) (trial court should have separately instructed the jury to consider mitigating evidence in the punishment phase of a capital-murder case); *Ex parte Williams*, No. AP–76,455, 2012 WL 2130951, at *20 (Tex.Crim.App. June 13, 2012) (Alcala, J., dissenting) (concluding that death-penalty scheme that applied in applicant's case was unconstitutional because it did not allow the jury to give meaningful consideration to mitigating evidence).

**6.** In addition to my opinion in *Moore*, I have written many other opinions concurring and dissenting from this Court's rejection of numerous intellectual-disability claims. *See, e.g., Ex parte Davis*, Nos. WR–40,339–07 & WR–40,339–08, 2016 WL 3094320 (Tex.Crim. App. May 25, 2016) (Alcala, J., concurring) (concurring in the Court's judgment denying relief as to applicant's intellectual-disability claim, but disavowing continued application of the factors set forth in *Ex parte Briseno*, 135 S.W.3d 1, 8–9 (Tex.Crim.App.2004)); *Ex parte Hunter*, No. WR–69,291–01, 2015 WL 2159808, at *2 (Tex.Crim.App. Apr. 22, 2015) (Alcala, J., concurring) (concurring in this Court's remand of applicant's *Atkins* claim in light of all the evidence of intellectual disability in the record); *Ex parte Lizcano*, No. WR–68,348–03, 2015 WL 2085190, at *1 (Tex. Crim.App. Apr. 15, 2015) (Alcala, J., dissenting) (concluding that applicant's claim that his intellectual disability barred his execution should be filed and set for full consideration rather than summarily denied on its merits); *Ex parte Campbell*, 439 S.W.3d 925, 927 (Tex. Crim.App.2014) (Alcala, J., dissenting), *cert. denied sub nom., Campbell v. Texas*, —— U.S. ——, 134 S.Ct. 2741, 189 L.Ed.2d 776 (2014) (concluding that applicant had presented enough evidence of intellectual disability to warrant reopening his previous application for writ of habeas corpus to determine if his disability exempted him from the death penalty); *Ex parte Ramirez*, No. WR–71,401–01, 2015 WL 6282336, at *1 (Tex.Crim.App. Oct. 14, 2015) (Alcala, J., concurring) (concluding that it is unconstitutional to execute an intellectually disabled person, but further concluding that applicant had waived his intellectual-disability claims); *Ex parte Ladd*, No. WR–42,639–03, 2015 WL 9594730 (Tex.Crim.App. Jan. 27, 2015) (Alcala, J., concurring) (joining the Court's dismissal of death-row inmate's application to file a subsequent writ of habeas corpus with the reservation that the Court should address the problems with the *Briseno* standard in a more appropriate case). I note here that the Supreme Court recently granted certiorari in the *Moore* case to decide "[w]hether it violates the Eighth Amendment and [the Supreme Court's] decisions in *Hall v. Florida*, [—— U.S. ——,] 134 S.Ct. 1986, [188

Supreme Court has also prohibited the death penalty for juvenile offenders, and that too has resulted in those offenders who might otherwise be sentenced to death receiving a life sentence. *See Roper*, 543 U.S. at 561, 125 S.Ct. 1183.

## II. Habeas Court Should Consider Facial Constitutional Challenge on Remand

Applicant argues that the Supreme Court's previous holdings permitting the death penalty have been contingent on societal acceptance of that punishment, and he asserts that this acceptance has since changed. Presenting recent statistics demonstrating the significant decline in the use of the death penalty in the United States, applicant suggests that it is time for this Court to reconsider whether society still considers this penalty an acceptable form of punishment. I conclude that applicant has presented adequate facts showing recent societal disapproval of the death penalty that require further development in the habeas court.

Applicant asserts that, in evaluating the constitutionality of the death penalty, it is proper to consider whether evolving societal standards now compel the conclusion that the punishment is so disproportionate as to be cruel and unusual. Applicant relies on *Roper v. Simmons* and *Gregg v. Georgia* to support his argument that it is proper to look to prevailing societal standards of decency when deciding whether a particular punishment violates the Eighth Amendment. *See Roper*, 543 U.S. at 561, 125 S.Ct. 1183 (2005); *Gregg v. Georgia*, 428 U.S. 153, 179, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976). When it held that the federal Constitution prohibited the execu-tion of juveniles, the Supreme Court in *Roper* looked to " 'the evolving standards of decency that mark the progress of a maturing society' to determine which punishments are so disproportionate as to be cruel and unusual." *Roper*, 543 U.S. at 551, 125 S.Ct. 1183 (quoting *Trop v. Dulles*, 356 U.S. 86, 100–101, 78 S.Ct. 590, 2 L.Ed.2d 630 (1958)). And when it held that the federal Constitution permitted capital punishment, the Supreme Court in *Gregg* noted that the constitutionality of that form of punishment was dependent on "society's endorsement of the death penalty for murder." *Gregg*, 428 U.S. at 179, 96 S.Ct. 2909 (joint opinion of Stewart, Powell, and Stevens, JJ.); *see also id.* at 171, 173, 96 S.Ct. 2909 (explaining that the Eighth Amendment prohibition on cruel and unusual punishment "has been interpreted in a flexible and dynamic manner" and "may acquire meaning as public opinion becomes enlightened by a humane justice"; thus, "an assessment of contemporary values concerning the infliction of a challenged sanction is relevant to the application of the Eighth Amendment") (citations and internal quotations omitted). At the time that *Gregg* was decided, the Supreme Court observed that thirty-five states had recently enacted statutes providing for the death penalty for at least some crimes that resulted in the death of another person. *Id.* at 179–80, 96 S.Ct. 2909. The Supreme Court called those legislative enactments "[t]he most marked indication of society's endorsement of the death penalty for murder[.]" *Id.* at 179, 96 S.Ct. 2909. Applicant asserts that, since 1976 when the Supreme Court relied on societal views accepting the death penalty as an appropriate form of punishment, society's endorsement of the penalty has

L.Ed.2d 1007] (2014), and *Atkins v. Virginia*, 536 U.S. 304, [122 S.Ct. 2242, 153 L.Ed.2d 335] (2002) to prohibit the use of current medical standards on intellectual disability, and require the use of outdated medical standards, in determining whether an individual may be executed." *Moore v. Texas*, No. 15–797, cert. granted June 6, 2016.

waned dramatically and, as a result, it can no longer be said that society endorses the death penalty as an acceptable form of punishment. As factual support for his claim, applicant observes that a majority of the jurisdictions in the United States now do not accept the death penalty as an acceptable form of punishment, as compared to the prevailing view in this country in 1976, when the Supreme Court in *Gregg* observed that the penalty was accepted by a majority of the jurisdictions in the United States. *See id.* Applicant asserts that, since 1976, nine states and the District of Columbia have joined the ten states that had already abolished the death penalty, bringing the total to twenty jurisdictions in the United States that now statutorily disallow the death penalty.[7] Applicant continues that, of the remaining thirty-one states, six of them have not executed anyone in more than a decade, and, thus, have effectively abolished the death penalty.[8] Applicant further observes that, in addition to these twenty-five states that have either statutorily or effectively abolished the death penalty, governors in four states have said that they will not sign death warrants during their terms because of the uneven way in which the punishment is carried out.[9] Concluding that the twenty-nine states disallowing the death penalty together now comprise a majority of jurisdictions in the United States, applicant argues that the death penalty is a constitutionally unacceptable form of punishment based on society's current standards of decency.

Applicant recognizes that a minority of states continue to use the death penalty for murder, including Texas, but he argues that these states are few in number and that, even within those states, support for capital punishment has diminished. Applicant notes that only five states have carried out an execution in 2015.[10] He also notes that, as of the time he filed this application, no jury had imposed a death sentence in Texas in 2015.[11] He relies on the significant decline in the imposition of the death penalty and the reduction in the number of executions being carried out to demonstrate that the people of the State of Texas also show diminished support for the death penalty.[12]

7. DEATH PENALTY INFORMATION CENTER: FACTS ABOUT THE DEATH PENALTY, http://www.death penaltyinfo.org/documents/FactSheet.pdf.

8. *Id.* at http://www.deathpenaltyinfo.org/jurisdictions-no-recent-executions. In addition to those six states, neither the federal government nor the United States military has carried out an execution in more than ten years.

9. *Id.* at http://www.deathpenaltyinfo.org/states-and-without-death-penalty.

10. *Id.* at http://www.deathpenaltyinfo.org/execution–list–2015.

11. After applicant filed his application, three capital-murder defendants were sentenced to death in 2015. Thus far in 2016, two capital-murder defendants have been sentenced to death.

12. I note here that, according to the Bureau of Justice Statistics, there has been a steep decline in the number of death sentences imposed in Texas since 1999. In that year, forty-eight people were sentenced to death for capital murder in Texas. In 2000, that number dropped to thirty-four; in 2001 it fell further to twenty-six; in 2002, it again rose briefly to thirty-seven before dropping more or less steadily each year up to the present: In 2003, there were twenty-nine new arrivals on Texas's death row; in 2004, there were twenty-three; in 2005, there were fourteen; in 2006, there were eleven; in 2007, there were fourteen; in 2008, there were nine; in 2009, there were eight; in 2010, there were eight; in 2011, there were eight; in 2012, there were nine; and in 2013, there were nine. *See* BUREAU OF JUSTICE STATISTICS, *Capital Punishment In the United States, 1999–2013,* available at http://www.bjs.gov/index.cfm?ty= pbse & sid=1.

Applicant's complaint appears to be a facial constitutional challenge that, under the holding in *Lykos v. Fine*, requires him to "prove that the system can never be constitutionally applied to any Texas defendant charged with capital murder, no matter what the individual facts and circumstances of the particular case." *Lykos v. Fine*, 330 S.W.3d 904, 908 (Tex.Crim. App.2011). In support of his argument, applicant has provided facts that have developed since his last application for habeas relief, which was filed in 2006. This Court should not reject claims in subsequent applications that are premised on new facts. *See* TEX.CODE CRIM. PROC. art. 11.071, § 5(a)(1); *Ex parte Campbell*, 226 S.W.3d 418, 421 (Tex.Crim.App.2007). And, if similar facts were proven and applied as a basis for the *Roper* standard, they may be likely to show that the death penalty is now an unacceptable form of punishment based on society's evolving standards of decency that inform the Eighth Amendment of the federal Constitution.[13] *See Roper*, 543 U.S. at 561, 125 S.Ct. 1183. At this pleading stage, all that is required is for this Court to determine whether to permit further evidentiary development of applicant's claim, and I conclude that applicant has met that standard. I, therefore, would permit factual development of this claim on remand in the same manner as this Court does today with respect to applicant's *Brady* and due-process claims.

## III. Habeas Court Should Consider As–Applied Constitutional Complaints on Remand

In addition to the other matters that should be remanded to the habeas court for factual development, I would also remand applicant's two primary remaining constitutional challenges. First, applicant contends that the death penalty is unconstitutional because it is arbitrarily imposed by race. Second, applicant asserts that Texas's death-penalty scheme is plagued by excessive delays and that this has resulted in cruel and unusual punishment, partly because, throughout this delay, he has been held in solitary confinement.

Under the holding in *Lykos* as it relates to as-applied constitutional challenges, applicant must "show that, in its operation, the challenged statute was unconstitutionally applied as to him; that it may be unconstitutional as to others is not sufficient (or even relevant)." *Lykos*, 330 S.W.3d at 910. Because he is a black male who has been incarcerated for almost twenty years for this offense, applicant appears to suggest that these systemic complaints specifically apply to him. I conclude that applicant has alleged adequate facts showing recent disparities in the imposition of the death penalty that have occurred since he filed his last habeas application so as to warrant further factual

13. *See* TEX.CODE CRIM. PROC. art. 11.071, § 5(a)(1) ("If a subsequent application for a writ of habeas corpus is filed after filing an initial application, a court may not consider the merits of or grant relief based on the subsequent application unless the application contains sufficient specific facts establishing that: (1) the current claims and issues have not been and could not have been presented previously in a timely initial application or in a previously considered application filed under this article ... because the factual or legal basis for the claim was unavailable on the date the applicant filed the previous application[.]"). This Court has explained that, in order to satisfy the Section 5 procedural bar, (1) "the factual or legal basis for an applicant's current claims must have been unavailable as to all of his previous applications," and (2) "the specific facts alleged, if established, would constitute a constitutional violation that would likely require relief from either the conviction or sentence." *Ex parte Campbell*, 226 S.W.3d 418, 421 (Tex.Crim. App.2007).

development of these assertions in the habeas court.

### A. Whether Race Improperly Influences Death Sentence

Applicant contends that the system for imposing the death penalty in Texas is unconstitutional, in part, because it is unduly influenced by improper considerations of race. It is axiomatic that it is constitutionally impermissible for the death penalty to be based on race. *See, e.g., McCleskey v. Kemp*, 481 U.S. 279, 309, 107 S.Ct. 1756, 95 L.Ed.2d 262 (1987) (describing race as an "irrelevant factor" that, if considered by the jury, may "impermissibly taint[ ] the capital sentencing decision," and further observing that, "[b]ecause of the risk that the factor of race may enter the criminal justice process, we have engaged in 'unceasing efforts' to eradicate racial prejudice from our criminal justice system") (quoting *Batson v. Kentucky*, 476 U.S. 79, 85, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986)); *California v. Brown*, 479 U.S. 538, 541, 107 S.Ct. 837, 93 L.Ed.2d 934 (1987) ("[D]eath penalty statutes [must] be structured so as to prevent the penalty from being administered in an arbitrary and unpredictable fashion").[14]

Applicant provides some evidentiary support for his contentions in this regard. Regarding the arbitrariness of the imposition of the death penalty based on the race of the offender, applicant notes that seventy-two percent of the offenders on death row in Texas are non-white.[15]

Applicant contends that it is unconstitutional for a defendant's risk of receiving a death sentence to depend on his race, which is a factor that has no connection to his culpability for the offense. Regarding this allegation, I conclude that applicant has, at the very least, alleged sufficient specific facts in support of his argument that Texas's death-penalty scheme results in a disproportionate number of minorities on death row so as to warrant further factual development in the habeas court.[16] Given both state and federal case law and the history of racial discrimination in this country, I have no doubt that race has been an improper consideration in particular death-penalty cases, and it is therefore proper to permit applicant the opportunity to present evidence at a hearing about the specifics in his case.

### B. Whether Solitary Confinement for a Decade is Cruel and Unusual

Asserting that Texas's death-penalty scheme is plagued by excessive delays, applicant notes that he has been incarcerated on death row for over seventeen years, as compared to the average length of time that a person is on death row, which is about eleven years. Applicant contends that the excessive delay in his case has resulted in cruel and unusual punishment, partly because, throughout this delay, he has been held in solitary confinement.

It is indisputable that people sentenced to death remain on death row for extended periods of time. The Institutional Division of the Texas Department of Criminal Justice shows that, as of today, about two-

---

**14.** In Texas, the State is statutorily prohibited from presenting evidence at the punishment phase to establish that the race or ethnicity of the defendant makes it likely that the defendant will engage in future criminal conduct. *See* Tex.Code Crim. Proc. art. 37.071, § 2(a)(2).

**15.** Texas Department of Criminal Justice, *Gender and Racial Statistics of Death Row Offend-*

*ers*, available at: https://www.tdcj.texas.gov/death_row/dr_gender_racial_stats.html.

**16.** The subject of Texas's improper use of race in the death-penalty context is pending before the Supreme Court in *Buck v. Stephens*, No. 15–8049. The Supreme Court granted certiorari in that case on June 6, 2016.

thirds of the population has been there for over ten years. About fifty people, or one in five of every Texas death-row inmate, has been on death row for twenty years or more.

As applicant points out, life on death row is essentially one spent in solitary confinement. Solitary confinement, also called "administrative segregation," is another aspect of Texas's death-penalty scheme that cries out for closer examination. In a recent Supreme Court case, Justice Kennedy wrote separately to illuminate the problems associated with solitary confinement. *See Davis v. Ayala*, —— U.S. ——, 135 S.Ct. 2187, 2208, 192 L.Ed.2d 323 (2015) (Kennedy, J., concurring). Justice Kennedy stated, "Years on end of near-total isolation exact a terrible price." *Id.* at 2210. He said, "There are indications of a new and growing awareness in the broader public of the subject of corrections and of solitary confinement in particular." *Id.* Noting that the public is largely unaware of the problems associated with the solitary confinement to be served by a defendant sentenced to death, Justice Kennedy continued,

> Sentencing judges, moreover, devote considerable time and thought to their task. There is no accepted mechanism, however, for them to take into account, when sentencing a defendant, whether the time in prison will or should be served in solitary. So in many cases, it is as if a judge had no choice but to say: "In imposing this capital sentence, the court is well aware that during the many years you will serve in prison before your execution, the penal system has a solitary confinement regime that will

bring you to the edge of madness, perhaps to madness itself." Even if the law were to condone or permit this added punishment, so stark an outcome ought not to be the result of society's simple unawareness or indifference.

*Id.* at 2209. In light of these considerations, and citing to a recent dissent by Justice Breyer, applicant concludes by arguing that the death penalty as it exists in this country today "now likely constitutes a legally prohibited 'cruel and unusual punishmen[t].'" *Glossip v. Gross*, —— U.S. ——, 135 S.Ct. 2726, 2756, 192 L.Ed.2d 761 (2015) (Breyer, J., dissenting).

I would hold that applicant's complaint that his solitary confinement for almost two decades rises to the level of cruel and unusual punishment should be addressed by the habeas court on remand.[17] I conclude that the decades-long confinement in a small individual cell with little human contact could rise to the level of cruel and unusual punishment, and I would thus permit applicant the opportunity to present evidence at a hearing about the specifics of that matter as it pertains to his case.

### IV. Conclusion

I agree with the Court's conclusion that applicant's first and second claims should be remanded to the habeas court, but, contrary to the Court's determination, I also conclude that applicant's third claim should be remanded to the habeas court for development of the record and for findings of fact and conclusions of law. Although it is true that in the past this Court has addressed claims similar to those presented by applicant, this Court has not

---

**17.** A nearly identical complaint was presented to the Supreme Court in *Moore v. Texas*, in which the issue was whether the execution of Moore decades after imposition of his death sentence would violate the Eighth Amendment's prohibition against cruel and unusual

punishment. *See Moore v. Texas*, 15–797. Although the Supreme Court granted certiorari as to another question presented in the same petition, *see supra* note 6, it refused review as to this issue.

permitted any applicant to have an evidentiary hearing on these matters in a habeas court in at least five years, even though applicants frequently assert similar claims as the instant applicant, and, with little explanation, this Court repeatedly cites to its precedent that does not take more current events into account. Applicant has presented arguments that are worthy of this Court's substantive review. He relies on emerging evidence that societal views have significantly shifted as compared to past acceptance of the death penalty, that the Texas scheme is imposed arbitrarily, and that the death-penalty procedure is so fraught with delay that it violates the Eighth Amendment. As my background overview of the Texas death-penalty scheme demonstrates, this Court should more rigorously examine the evidentiary basis of capital-murder cases, and the first step in that process requires us to permit habeas applicants to factually develop their complaints through evidentiary hearings.

At this juncture, I do not decide the ultimate merits of applicant's arguments that the death penalty is unconstitutional, though it should be evident from my numerous opinions on this subject that, in my view, the Texas scheme has some serious deficiencies that have, in the past, caused me great concern about this form of punishment as it exists in Texas today. Rather than refuse to afford applicant the opportunity to factually develop his complaints as this Court does today, I would instead permit applicant to make an evidentiary record of his assertions and to have the habeas court make findings of fact and conclusions of law. I, therefore, respectfully dissent in part to the Court's order that refuses to remand applicant's third claim.

Appendix a—Possible Ways of Committing Capital Murder Pursuant to Texas Penal Code Section 19.03

1. murder of a peace officer,

Appendix a—Possible Ways of Committing Capital Murder Pursuant to Texas Penal Code Section 19.03—Continued

2. murder of a fireman,

3. murder in the course of committing kidnapping,

4. murder in the course of attempt to commit kidnapping,

5. murder in the course of committing burglary,

6. murder in the course of attempt to commit burglary,

7. murder in the course of committing robbery,

8. murder in the course of attempt to commit robbery,

9. murder in the course of committing aggravated sexual assault,

10. murder in the course of attempt to commit aggravated sexual assault,

11. murder in the course of committing arson,

12. murder in the course of attempt to commit arson,

13. murder in the course of committing obstruction,

14. murder in the course of attempt to commit obstruction,

15. murder in the course of committing retaliation,

16. murder in the course of attempt to commit retaliation,

17. murder in the course of committing a terroristic threat by threatening to commit any offense involving violence to any person or property with intent to cause any type of reaction to his threat by an official organized to deal with emergencies,

18. murder in the course of committing a terroristic threat by threatening to commit any offense involving violence to any person or property with intent to cause a reaction to

his threat by a volunteer agency organized to deal with emergencies,

19. murder in the course of committing a terroristic threat by threatening to commit any offense involving violence to any person or property with intent to prevent or interrupt the occupation or use of a building,

20. murder in the course of committing a terroristic threat by threatening to commit any offense involving violence to any person or property with intent to prevent or interrupt the occupation or use of a room,

21. murder in the course of committing a terroristic threat by threatening to commit any offense involving violence to any person or property with intent to prevent or interrupt the occupation or use of a place of assembly,

22. murder in the course of committing a terroristic threat by threatening to commit any offense involving violence to any person or property with intent to prevent or interrupt the place to which the public has access,

23. murder in the course of committing a terroristic threat by threatening to commit any offense involving violence to any person or property with intent to prevent or interrupt the place of employment or occupation,

24. murder in the course of committing a terroristic threat by threatening to commit any offense involving violence to any person or property with intent to prevent or interrupt the aircraft,

25. murder in the course of committing a terroristic threat by threatening

to commit any offense involving violence to any person or property with intent to prevent or interrupt the automobile,

26. murder in the course of committing a terroristic threat by threatening to commit any offense involving violence to any person or property with intent to prevent or interrupt the other form of conveyance,

27. murder in the course of committing a terroristic threat by threatening to commit any offense involving violence to any person or property with intent to prevent or interrupt the public place,

28. murder in the course of committing a terroristic threat by threatening to commit any offense involving violence to any person or property with intent to cause impairment or interruption of public communications,

29. murder in the course of committing a terroristic threat by threatening to commit any offense involving violence to any person or property with intent to cause impairment or interruption of public transportation,

30. murder in the course of committing a terroristic threat by threatening to commit any offense involving violence to any person or property with intent to cause impairment or interruption of public water,

31. murder in the course of committing a terroristic threat by threatening to commit any offense involving violence to any person or property with intent to cause impairment or interruption of gas,

32. murder in the course of committing a terroristic threat by threatening

to commit any offense involving violence to any person or property with intent to cause impairment or interruption of power supply,

33. murder in the course of committing a terroristic threat by threatening to commit any offense involving violence to any person or property with intent to cause impairment or interruption of other public service,

34. murder in the course of committing a terroristic threat by threatening to commit any offense involving violence to any person or property with intent to place the public or a substantial group of the public in fear of serious bodily injury,

35. murder in the course of committing a terroristic threat by threatening to commit any offense involving violence to any person or property with intent to influence the conduct or activities of a branch or agency of the federal government,

36. murder in the course of committing a terroristic threat by threatening to commit any offense involving violence to any person or property with intent to influence the conduct or activities of a branch or agency of the state,

37. murder in the course of committing a terroristic threat by threatening to commit any offense involving violence to any person or property with intent to influence the conduct or activities of a branch or agency of a political subdivision of the state, 38. murder in the course of attempting to commit a terroristic threat by threatening to commit any offense involving violence to any person or property with intent to cause a reaction to his threat by an official to deal with emergencies,

38. murder in the course of attempting to commit a terroristic threat by threatening to commit any offense involving violence to any person or property with intent to cause a reaction to his threat by a volunteer agency organized to deal with emergencies,

39. murder in the course of attempting to commit a terroristic threat by threatening to commit any offense involving violence to any person or property with intent to prevent or interrupt the occupation or use of a building,

40. murder in the course of attempting to commit a terroristic threat by threatening to commit any offense involving violence to any person or property with intent to prevent or interrupt the occupation or use of a room,

41. murder in the course of attempting to commit a terroristic threat by threatening to commit any offense involving violence to any person or property with intent to prevent or interrupt the occupation or use of a place of assembly,

42. murder in the course of attempting to commit a terroristic threat by threatening to commit any offense involving violence to any person or property with intent to prevent or interrupt the place to which the public has access,

43. murder in the course of attempting to commit a terroristic threat by threatening to commit any offense involving violence to any person or property with intent to prevent or

interrupt the place of employment or occupation,

44. murder in the course of attempting to commit a terroristic threat by threatening to commit any offense involving violence to any person or property with intent to prevent or interrupt the aircraft,

45. murder in the course of attempting to commit a terroristic threat by threatening to commit any offense involving violence to any person or property with intent to prevent or interrupt the automobile,

46. murder in the course of attempting to commit a terroristic threat by threatening to commit any offense involving violence to any person or property with intent to prevent or interrupt the other form of conveyance,

47. murder in the course of attempting to commit a terroristic threat by threatening to commit any offense involving violence to any person or property with intent to prevent or interrupt the public place,

48. murder in the course of attempting to commit a terroristic threat by threatening to commit any offense involving violence to any person or property with intent to cause impairment or interruption of public communications,

49. murder in the course of attempting to commit a terroristic threat by threatening to commit any offense involving violence to any person or property with intent to cause impairment or interruption of public transportation,

50. murder in the course of attempting to commit a terroristic threat by

threatening to commit any offense involving violence to any person or property with intent to cause impairment or interruption of public water,

51. murder in the course of attempting to commit a terroristic threat by threatening to commit any offense involving violence to any person or property with intent to cause impairment or interruption of gas,

52. murder in the course of attempting to commit a terroristic threat by threatening to commit any offense involving violence to any person or property with intent to cause impairment or interruption of power supply,

53. murder in the course of attempting to commit a terroristic threat by threatening to commit any offense involving violence to any person or property with intent to cause impairment or interruption of other public service,

54. murder in the course of attempting to commit a terroristic threat by threatening to commit any offense involving violence to any person or property with intent to place the public or a substantial group of the public in fear of serious bodily injury,

55. murder in the course of attempting to commit a terroristic threat by threatening to commit any offense involving violence to any person or property with intent to influence the conduct or activities of a branch or agency of the federal government,

56. murder in the course of attempting to commit a terroristic threat by threatening to commit any offense

involving violence to any person or property with intent to influence the conduct or activities of a branch or agency of the state,

57. murder in the course of attempting to commit a terroristic threat by threatening to commit any offense involving violence to any person or property with intent to influence the conduct or activities of a branch or agency of a political subdivision of the state,

58. murder for remuneration,

59. murder for the promise of remuneration,

60. murder while escaping from a penal institution,

61. murder while attempting to escape from a penal institution,

62. murder while incarcerated in a penal institution,

63. murder with the intent to establish, maintain, or participate in a combination,

64. murder with the intent to establish, maintain, or participate in the profits of a combination,

65. murder while incarcerated for capital murder,

66. murder while incarcerated for murder,

67. murder while serving a sentence of life imprisonment for aggravated kidnapping,

68. murder while serving a sentence of life imprisonment for aggravated sexual assault,

69. murder while serving a sentence of life imprisonment for aggravated robbery,

70. murder while serving a sentence of ninety-nine years for aggravated kidnapping,

71. murder while serving a sentence of ninety-nine years for aggravated sexual assault,

72. murder while serving a sentence of ninety-nine years for aggravated robbery,

73. murder of more than one person during the same criminal transaction,

74. murder of more than one person pursuant to the same scheme or course of conduct,

75. murder of a person under six years of age,

76. murder of another person in retaliation for the service as justice of the supreme court,

77. murder of another person in retaliation for the service as judge of the court of criminal appeals,

78. murder of another person in retaliation for the service as justice of a court of appeals,

79. murder of another person in retaliation for the service as a judge of a district court,

80. murder of another person in retaliation for the service as a judge of a constitutional county court,

81. murder of another person in retaliation for the service as a judge of a statutory county court,

82. murder of another person in retaliation for the service as a judge of a justice court,

83. murder of another person in retaliation for the service as a judge of a municipal court,

84. murder of another person in retaliation for the status as justice of the supreme court,
85. murder of another person in retaliation for the status as judge of the court of criminal appeals,
86. murder of another person in retaliation for the status as justice of a court of appeals,
87. murder of another person in retaliation for the status as a judge of a district court,
88. murder of another person in retaliation for the status as a judge of a constitutional county court,
89. murder of another person in retaliation for the status as a judge of a statutory county court,
90. murder of another person in retaliation for the status as a judge of a justice court, and
91. murder of another person in retaliation for status as a judge of a municipal court.